Filed 5/28/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S083594 |
| v. | ) | |
| | ) | |
| TOMMY ADRIAN TRUJEQUE, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. VA048531 |
| _____ | ) | |

In 1999, a jury convicted defendant Tommy Adrian Trujeque of first degree murder of Max Facundo (Pen. Code, § 187, subd. (a)),[1] second degree murder of Raul Luis Apodaca (§ 187, subd. (a)), and second degree robbery of Ronni Mandujano and Spartan Burgers restaurant (§ 211). As to all three counts, it found that defendant personally used a deadly and dangerous weapon, respectively, a knife, a screwdriver, and a handgun. (Former §§ 12022, 12022.5, subd. (a)(1), 12022.53, subd. (b).) Waiving a jury trial, defendant stipulated to a 1971 prior second degree murder conviction alleged as a special circumstance, and admitted other prior convictions alleged in the information. As to both murder counts, the jury found true the special-circumstance allegation of multiple murder

_____

[1] All further statutory references are to the Penal Code unless otherwise noted.

(§ 190.2, subd. (a)(3)), while the trial court found true the prior murder special-circumstance allegation (§ 190.2, subd. (a)(2)).  After a penalty trial, the jury returned a verdict of death.  The court denied the automatic motion to modify the verdict (§ 190.4), and imposed a sentence of death, along with an additional consecutive term of 25 years to life in prison for the robbery count.  The trial court also sentenced defendant to various consecutive sentence enhancements, all of which were stayed pending imposition of the death judgment.  This appeal is automatic.  (§ 1239, subd. (b).)

Defendant's 1999 trial took place more than a decade after the murders of Facundo and Apodaca, and the delay in prosecution is the subject of various claims defendant raises on appeal.  For reasons that follow, we reverse the judgment of conviction for the second degree murder of Apodaca, and reverse the penalty judgment based on our setting aside both the prior murder and multiple murder special-circumstance findings.  (See *post*, at p 67.)  Although we must reverse the penalty judgment, we have included additional factual background as necessary to provide context.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Guilt Phase

#### 1. *Prosecution evidence*

##### a. *Murder of Max Facundo*

The prosecution presented evidence that on June 21, 1986, defendant stabbed and killed Max Facundo, the abusive boyfriend of defendant's cousin, Charlene Trujeque.[2]

---

[2]     To avoid confusion, we have used first names when necessary.

When Charlene was 16 or 17 years old, defendant began writing letters to her while he was incarcerated. In the letters, defendant asked about his family and told Charlene to stay out of trouble. Charlene's mother, Elena Trujeque, read the letters defendant had sent and became concerned. In particular, Elena thought one of the letters read more like a "love letter" than a "cousinly" letter because defendant said he would protect Charlene if anybody hurt her, and that she "mean[t] the world to" him. He also wrote "you'll always be mine and you'll always be close to my heart." Elena also discovered that Charlene was accepting collect telephone calls from defendant, who was still incarcerated. Elena and Charlene's father, Charlie Trujeque, tried to stop Charlene from getting "too friendly" with defendant, but Charlene continued to write to him.

In 1984, when Charlene was about 20 years old, she began dating Facundo and often stayed at his house. Though their relationship appeared fine at first, during the final months of their relationship, Facundo began to beat up Charlene when she refused to do drugs with him. She did not tell her parents (defendant's uncle and aunt) about the beatings, but they would see her bruised face when she came home. Elena recalled seeing injuries on Charlene, including black eyes and bruises, on 15 to 20 separate occasions. Though Charlene lied to her parents about how she got her injuries, Elena said "everybody knew" that Facundo beat up their daughter. While Charlene's parents were upset and afraid for her life, they voiced their concerns only to Charlene, and repeatedly asked Charlene to end her relationship with Facundo. Although Charlie did not verbally threaten Facundo, he told Elena that he was going to beat up Facundo and once ran after him with a baseball bat. On one visit, after Facundo refused to let them see their daughter, Charlie and Elena went to the police to report the domestic violence. However, the parents were told that the police could not do anything unless Charlene reported it herself.

3

After defendant was released from prison in May 1986, he and Charlene met for the first time at her parents' house. Charlene did not mention Facundo to defendant and she did not have any visible injuries. According to Elena, the two talked all night.

On the evening of June 21, 1986, the day Facundo was killed, Charlene was at her parents' house and sported a black eye. Defendant came over with another cousin, Raymond Guzman. Almost as soon as they got there, defendant and Raymond called Charlie outside to talk. They spoke for about five minutes. When Elena asked Charlie what they had talked about, Charlie would not respond; he seemed nervous and afraid. However, sometime earlier, Charlie had asked defendant to break Facundo's leg or arm to teach him a lesson, but not to hurt him too badly.

When defendant asked Charlene how she got her black eye and if her boyfriend did it, she would not say. Defendant repeatedly asked Charlene whether Facundo would be coming by later because defendant wanted to "meet him and talk to him." Charlene could tell defendant was angry about her black eye, so she asked him to promise not to hurt Facundo. He replied that promises were made to be broken, but that she need not worry because nothing would happen.

When Facundo came to Charlie and Elena's house to pick up Charlene, defendant asked Charlene if they would drop off both defendant and Raymond at the home of Raymond's sister, Pat Perez, in South Gate. Facundo agreed to do so, and the four left in Facundo's car. Defendant and Raymond were seated in the back, Charlene was in the front passenger seat, and Facundo was driving. Facundo pulled out a cigarette dipped in PCP, began smoking it, and shared it with Charlene and Raymond. At some point, Facundo pulled over to let Charlene drive. They arrived at Pat's house around 10:45 p.m. Charlene exited the car to let Raymond out of the backseat. She and Raymond walked towards Pat's home,

4

and waited for Facundo and defendant to follow.  When she heard yelling, Charlene turned around and saw Facundo and defendant struggling.  She ran towards them and screamed for them to stop.  Charlene held Facundo, who was covered in blood, and they fell onto the ground.  Defendant fled the scene.  Facundo died of multiple stab wounds to the chest.

When the police arrived at the scene of the stabbing, Charlene was still screaming.  The police handcuffed her hands and feet and placed her on her stomach in a patrol car.  They eventually transported her to the police station.  Charlene's blouse was ripped and she had cuts on her chest and right forearm.  Detective Terry McWeeney of the South Gate Police Department interviewed both Charlene and Raymond while they were in custody.  Charlene told the detective she saw Facundo lying in the street, but did not see defendant or Raymond.  She never told the police that defendant had killed Facundo.

Pat called Charlie and Elena and told them that defendant had killed Facundo and that the police had already taken Charlene and Raymond to the station.  They tried calling the police station, but could not get any information.  They returned home.  Defendant later called Charlie and Elena's house and asked for a ride.  According to Elena, they picked defendant up at a 7-Eleven convenience store on the corner of Firestone and Atlantic in South Gate.  He asked to be dropped off at his mother's house in El Sereno.  During the drive, defendant told Charlie and Elena that he killed Facundo.  Charlie yelled at him, " '[W]hy did you do it,' " and told defendant he never wanted him to kill Facundo.  Elena testified defendant told her, " '*Tia* [meaning "aunt" in Spanish], you don't have to worry anything more about this anymore.' "  Elena also testified defendant told her he "had no remorse.  He did it like — like it was nothing.  He didn't know the guy, like I didn't know him.  He had no feelings for him, so he just done [sic] him away."

5

Hours after the murder, around 2 or 3 a.m., Sergeant Russell Beecher of the South Gate Police Department received a call from a man identifying himself as defendant. The caller said that he was the one who murdered Facundo and that Charlene and Raymond, who were in custody, should be released. On June 26, 1986, defendant was arrested at his mother's house in El Sereno for the murder of Facundo. The charges, however, were dropped on July 2, 1986 for lack of probable cause.

For over a decade, the case remained dormant until 1998 when defendant — who at the time was serving a life sentence for an unrelated armed robbery — contacted the Los Angeles County Sheriff's Department and confessed to Facundo's murder, along with the murder of Raul Apodaca and another armed robbery, in order to receive the death penalty. In June 1998, he was charged with the 1986 murder of Facundo in a three-count complaint.

### b. *Murder of Raul Apodaca*

At trial, the prosecution also presented evidence that on January 23, 1987, defendant and Jesse Salazar[3] killed Raul Luis Apodaca at an East Los Angeles upholstery shop owned by Richard "Conejo" Rivera.[4] Rivera dealt drugs from the shop, which also served as a hangout for White Fence gang members.

---

[3] Salazar was originally charged with defendant for Apodaca's murder. On December 29, 1987, Salazar pleaded guilty to voluntary manslaughter and received a sentence for time served and five years' probation. Though Salazar was the main perpetrator, the original prosecutor explained that Salazar received voluntary manslaughter "based on the fact that at that time we did not have our witnesses, and I believe the public defender thought it was more prudent to take the plea just in case we might find them."

[4] By the time of defendant's 1999 trial, Rivera had died and was therefore " 'unavailable as a witness' " (Evid. Code, § 240, subd. (a)(3)); thus, his testimony from the April 8, 1987 preliminary hearing was read into the record.

During the 1999 trial, Robert De Alva testified that he was at the upholstery shop drinking and doing drugs the evening of January 23, 1987. Given his admitted drug use, De Alva explained he had a poor memory and could not recall many details from that night except that he and six to eight other individuals had walked to the upholstery shop from a nearby bar, the Quiet Cannon. At the shop, De Alva had injected heroin and had passed out on a table. When the prosecution asked about Apodaca being killed, he said: "All I remember is a guy laid on the floor and taking him to the hospital and some guys around him and some guys leaving, and that's all I remember." Though he did see some "scuffling," De Alva was "not aware there was a fight" and did not know who was involved. De Alva also did not recall much of the previous statement he had given to Detective Birl Adams several days after the murder. When the prosecution pointed to defendant at the defense table and asked if De Alva had seen him that night, De Alva replied: "He don't look familiar."

Responding to De Alva's prior inconsistent statements, Detective Adams testified that when he interviewed De Alva on January 26, 1987, three days after the killing, De Alva recounted many details about the night Apodaca was killed. De Alva told Detective Adams that he was at the upholstery shop with Rivera, Salazar, Apodaca, defendant, and several other individuals. They were playing poker when a fight broke out. After the fight was broken up, two individuals left the shop and De Alva lay down on top of a table in the middle of the shop to sleep. Remaining at the shop with Rivera and De Alva were defendant, Salazar, and Apodaca. De Alva woke up when he heard and saw defendant, Salazar, and Apodaca fighting. Suddenly, Apodaca fell to the floor, and defendant and Salazar ran out of the shop. After checking on Apodaca, Rivera told De Alva that Apodaca had been stabbed. They tried to resuscitate Apodaca, and then took him to East Los Angeles Doctors Hospital in a van. De Alva stayed at the hospital

7

about 15 minutes and then left. Apodaca later died from a stab wound to the chest. De Alva first found out that Apodaca had died during the January 26 interview with Detective Adams; he appeared upset. De Alva had no trouble describing either defendant or Salazar to Detective Adams. Two days later, on January 28, 1987, De Alva identified defendant and Salazar from a 13-photo array Detective Adams showed him.

The upholstery shop's owner Richard Rivera (whose testimony from defendant's April 8, 1987 preliminary hearing was read into the trial record) gave a similar account of the events. (See *ante*, at p. 6, fn. 4.) He testified that during the poker game, Salazar and Frank Contreras got into a fist fight. In breaking up the fight, Apodaca grabbed and restrained Salazar, and Luis Villalobos grabbed Contreras. After the fight, everyone starting leaving one by one, except for Rivera, defendant, Salazar, Apodaca, and De Alva. Except for De Alva, all had been staying at the shop for the past few days. Rivera went to the bathroom. When he came out "a couple minutes" later, Apodaca was lying on his back and not breathing. Rivera and De Alva opened up his shirt and saw that he had a puncture wound in his chest. Rivera did not see either defendant or Salazar in the shop, but when he went outside, he saw them walking away quickly. After Rivera and De Alva both tried to give Apodaca mouth-to-mouth resuscitation, they dragged him into a van and drove him to a hospital. Rivera did not call the police because he "figured Raul [Apodaca] was going to live, and he could deal with it if they questioned him. I didn't think that Raul was going to die." He lied to both the nurse and Apodaca's stepfather, telling them that Apodaca had been stabbed at the Quiet Cannon bar and not at his upholstery shop because "I just didn't want it to go down at the shop, I guess."

On February 5, 1987, defendant and Salazar were charged with the murder of Apodaca. The case was dismissed a month later. The prosecution eventually

8

entered into a plea agreement with Salazar, who pleaded guilty to voluntary manslaughter. On March 25, 1987, the prosecution refiled the first degree murder charge against defendant, but after the preliminary hearing, he was held to answer for only the lesser offense of manslaughter. On April 24, 1987, the prosecution filed an information again charging defendant with the first degree murder of Apodaca. After the prosecution informed the court that they could not find the material witness, De Alva, the murder charge was dismissed on June 23, 1987. The case lay dormant until 1998, when defendant confessed to the murder.

### c. *Robbery of Spartan Burgers restaurant*

The prosecution presented evidence that on January 21, 1998, defendant robbed Spartan Burgers restaurant in Huntington Park. According to the restaurant's cashier, Ronni Mandujano, defendant came in around 8:00 p.m. and first ordered food. When it came time to pay, defendant pulled out a small black handgun and demanded money. The restaurant's owner (who was not identified by name) approached Mandujano and defendant, opened the register, and placed the cashbox on the counter. Pointing the gun at Mandujano the entire time, defendant asked the owner if he had any other money in the restaurant. The owner said there was additional money in the back. Defendant ordered Mandujano and the owner to the back. Defendant pushed Mandujano, who could feel defendant pressing the gun on her back and head. After the owner gave him more money, defendant left. Mandujano called the police. A few months later, on April 29, 1998, Mandujano identified defendant from a six-pack photo array. She testified that she was "positive" it was defendant and also identified him in the courtroom.

### 2. *Defense evidence*

#### a. *Murder of Max Facundo*

Against the advice of counsel, defendant testified on his own behalf. His account of Facundo's killing and events surrounding it largely tracked the evidence adduced at trial. (See *ante*, at pp. 2-6.) However, defendant's version differed in these material respects: Defendant testified that Charlie had asked him to kill Facundo not just hurt him, and that Elena was lying about Charlie asking him only to break Facundo's arms and legs. On cross-examination, however, defendant admitted Charlie never used the words "go kill him" but said to "take care of it," which defendant took to mean "killing Max and getting away with it." Though Charlie never told defendant why he wanted him to kill Facundo, defendant thought it was "because he was beating up on my cousin." Though Elena sent him money while he was incarcerated, defendant did not kill Facundo for the money. Elena also told defendant that Facundo beats up Charlene "just about every day." Elena also gave him $300 to buy a gun.

Defendant testified he intended to inflict a lethal wound on Facundo by using a method of stabbing he learned in prison; he also hoped to inflict at least 100 stab wounds. He also admitted he "couldn't wait to kill him. I didn't want to wait," and that he "could have done it later if I wanted to." Defendant stated he had been thinking about killing Facundo since he was released from prison. When Charlie and Elena picked defendant up after the killing, defendant said their "troubles are over," meaning "I don't have to watch my back for anyone coming after me, and Charlene doesn't have to worry about getting any black eyes, so it's over."

#### b. *Murder of Raul Apodaca*

Defendant testified that both he and Rivera were members of the White Fence gang, and that he and others used to frequent Rivera's upholstery shop.

10

Defendant's gang moniker was "Killer"; a piece of wood bearing that name was found at the shop.

His account of the events leading up to the killing of Apodaca largely tracked eyewitness De Alva's trial testimony and Rivera's testimony from the preliminary hearing. As to the fight between Salazar and Apodaca, defendant testified that he thought that Salazar was getting the worse of the fight, so defendant stepped in to help his friend. Apodaca, who was on top of Salazar, struck defendant in the face. Defendant picked up a screwdriver and stabbed Apodaca two or three times. He saw Salazar stab Apodaca in the chest with another screwdriver. Defendant recalled stabbing Apodaca on the left side, but did not remember the exact location or number of stabbings. Defendant did not know who was responsible for the lethal wound.

### c.   Robbery of Spartan Burgers restaurant

On cross-examination, defendant denied robbing Spartan Burgers and claimed the main witness, Ronni Mandujano, was "wrong." Defense counsel did not cross-examine Mandujano.

### 3.   Defendant's confession to the murders and desire to be prosecuted

### a.   1998 confession to Los Angeles County Sheriff's deputies

The Facundo and Apodaca murder cases lay dormant for over 10 years. In February 1998, Los Angeles County Sheriff's Deputy Frank Durazo received a telephone call from another deputy regarding an inmate, defendant. Defendant was in custody in the San Diego County Jail and claimed to have information about two homicides and a robbery. Deputy Durazo and his partner, Los Angeles County Sheriff's Deputy Jose Romero, drove to San Diego to interview defendant. The February 20, 1998, tape-recorded interview, a transcript of which was admitted as an exhibit, was played for the jury but was not simultaneously

11

transcribed into the record. Defendant's statement to the deputies about the Facundo and Apodaca murders and the Spartan Burgers robbery was generally consistent with his testimony at trial.

As to the Apodaca murder, however, defendant provided further context. According to defendant, before heading to Rivera's upholstery shop from the Quiet Cannon bar, Salazar had told defendant that he hated Apodaca and wanted to kill him. Salazar said he was going to stab Apodaca and that he wanted defendant " 'to have my back, and if — and if — if he starts getting the best of me and everything just, you know, just back my play.' " Later, when Apodaca and Salazar started fighting at the upholstery shop and defendant intervened, Apodaca hit defendant in the face. That is when, according to defendant, "automatically my — the red light goes on and the alarm goes off and I get, you know, that did it, and I said now fuck this mother fucker, I don't even know him, he ain't done nothing to me, but I just don't like him, because of the way he is, you know." As defendant reached for a screwdriver, he saw Salazar on top of Apodaca, stabbing him. Defendant then stabbed Apodaca two or three times on the left side of his body. After defendant was arrested, he "gave [Salazar] up."

Regarding the Spartan Burgers robbery, which at trial defendant denied committing, defendant initially told the deputies that he had robbed the restaurant with his cousin, Theodore "Teddy" Trujeque (Charlene's brother and Elena and Charlie's son), because Teddy needed money. Defendant thought he "got about close to $400," of which he gave Teddy $150 and kept the rest. Defendant did not tell authorities about Teddy's involvement for "personal reasons."

#### b. *Letter to Los Angeles County District Attorney*

Over defense counsel's objection, the prosecution introduced a letter defendant had written to then Los Angeles County District Attorney Gil Garcetti

12

(Garcetti letter).  In the over-600-word letter, written shortly before his September 1998 preliminary hearing and while he was representing himself, defendant admitted he murdered both Apodaca and Facundo while "fully aware of all of my mental faculties" and urged Garcetti to seek the death penalty against him.  The Garcetti letter also stated that "both of those cowards deserved what they got: death and an early expiration in life, to say the least!"; that if he "had the opportunity to do it over I would cut off their heads and send 'em both to their family!"

## B.  Penalty Phase

### 1.  *Aggravating evidence*

#### a.  *Murder of Allen Rothenberg*

At trial, the prosecution presented evidence that on February 7, 1969, less than a month after he turned 16 years old, defendant robbed and fatally stabbed Allen Rothenberg.[5]  Rothenberg was delivering beer for Nate's Liquor Store to defendant's home at 3302 Paola Avenue in Los Angeles.  In a 1969 statement to detectives, which was read to the jury, defendant said he called up Nate's Liquor Store as "Mr. Martinez" and ordered a case of Colt 45 beer.  Defendant stated he was talking to a girl in the bedroom when his friend, Bert Gonzalez, told him someone was at the door.  Defendant told detectives:  "I already had a knife with me because I already had it planned that I was going to rob the guy when he got there."  Defendant "got a knife and put it around [Rothenberg's] neck and threw

---

[5]     To show the nature and circumstances of defendant's prior violent conduct (§ 190.3, factor (b)), the prosecution — over defense counsel's objection — elicited testimony from Officer Sanchez, who knew and lived near the victim and his family, that Rothenberg had a "handicap," i.e., he was both "mentally slow" and "physically slow" with one bad leg and a foot that he dragged.

13

him on the floor and told him this was a holdup. . . . [¶] . . . [¶] I just — I kept — I just kept stabbing him." He stated he did not remember how many times he stabbed Rothenberg, but that Rothenberg "kept on giving me a hassle and finally he settled down and he just laid there." Defendant dragged Rothenberg's body through the bedroom and down the stairs. Bert helped defendant throw his body over the next yard. Defendant indicated he cut his hands because his hand "kept sliding down the blade" when he was stabbing Rothenberg.

Former Los Angeles Police Officer Ruben Sanchez, who responded to the call at 3302 Paola, testified that officers found Rothenberg's body in the yard next door. Rothenberg had been stabbed multiple times in the chest and his pants pockets were turned inside out. A trail of blood led back into the house where detectives found blood in the dining room, a bloody door knob, and blood splats on the wall. An investigator located a bloody 13-inch kitchen knife at the side of the house. Officer Sanchez identified numerous photographs of the Rothenberg crime scene, which were introduced into evidence. The trial court took judicial notice of defendant's juvenile court files.

### b.  Other offenses

The prosecution presented evidence that defendant committed a number of assaults and robberies from 1978 to 1998.

### c.  Garcetti letter

Over defense counsel's renewed objection, the trial court admitted the Garcetti letter at the penalty phase. This version, which had fewer redactions than the version admitted at the guilt phase, included defendant's statement that he did not "regret my actions in any way, shape, or form" and his threat to kill someone in prison if he did not get the death penalty.

14

### 2. *Mitigating evidence*

#### a. *Family history*

Through the testimony of defendant's half sister and several maternal aunts and uncles, defendant presented evidence of his childhood and his mother's family history. On defendant's behalf, his ex-wife and their daughter, along with his former juvenile probation officer and parole officer, all testified. Defense counsel also presented testimony from a psychiatrist who evaluated defendant as a juvenile and from an expert witness on gangs.

#### b. *Medical history*

Dr. Marshall Cherkas, who examined defendant for the juvenile court in November 1966 and shortly before defendant's 1999 trial, testified that he found defendant emotionally unstable with borderline organic brain damage and a history of treatment for psychomotor epilepsy.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *The invalidity of the second degree murder conviction underlying the prior murder special-circumstance allegation*

In support of the prior murder special circumstance (§ 190.2, subd. (a)(2)), the prosecution alleged defendant's prior conviction for the second degree murder of Allen Rothenberg. In 1971, defendant pleaded guilty to second degree murder after he was deemed not fit to be tried in juvenile court and was prosecuted in adult court. (See Welf. & Inst. Code, former § 707, as amended by Stats. 1967, ch. 1357, § 1, p. 3197.) Before the 1999 trial in the instant matter, defendant moved to strike the prior murder conviction and related special-circumstance allegation based on the claim that his guilty plea was invalid under *Boykin/Tahl* — that is, he was not advised of, nor did he waive, his constitutional rights to a trial and to confront and cross-examine witnesses, and his right against self-

15

incrimination.  (See *Boykin v. Alabama* (1969) 395 U.S. 238; *In re Tahl* (1969) 1 Cal.3d 122.)  The trial court denied the motion.

On appeal, defendant raises only a double jeopardy challenge.  He argues that the high court's 1975 decision in *Breed v. Jones* (1975) 421 U.S. 519, 531 (*Breed*), which held that an adult prosecution after a juvenile adjudication for the same offense violates double jeopardy, compels the conclusion that he was placed at least twice[6] in jeopardy.  (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 15.)  The Attorney General, however, counters that defendant has waived, or more accurately, has forfeited this double jeopardy claim because he failed to raise it below, and that in any event, he cannot collaterally challenge his prior conviction.  For reasons that follow, we conclude that defendant has not forfeited the issue nor is he estopped from collaterally challenging his 1971 murder conviction.

### a.    *Procedural background*

The facts of Rothenberg's killing are discussed above.  (See *ante*, at pp. 13-14.)  As relevant here, on February 11, 1969, a petition was filed in juvenile court alleging that defendant, a 16-year-old minor, came within the then current provisions of Welfare and Institutions Code section 602.  (See Stats. 1961, ch. 1616, § 2, p. 3472; section 602 petition.)  Paragraph I of the petition alleged that

---

**6**     Defendant argues that he was actually placed in jeopardy *three* times.  As discussed further below, he adds that jeopardy also attached at the April 7, 1969 de novo rehearing where the juvenile court, after considering the March hearing transcripts and additional evidence, abandoned the referee's findings and concluded defendant should be prosecuted as an adult.  (See *Jesse W. v. Superior Court* (1979) 26 Cal.3d 41, 48 ["if petitioner is subjected to rehearing de novo procedures . . . he would be exposed to jeopardy"].)  For her part, the Attorney General counters that *Jesse W.* may not be applied retroactively or used to collaterally challenge the prior conviction.  It is unnecessary to discuss this third attachment of jeopardy because, as we explain below, defendant's claim that he was placed twice in jeopardy has merit.  (See *post*, at p. 26.)

defendant "did wilfully, unlawfully, and with malice aforethought murder Allen Howard Rothenberg," in violation of section 187, and paragraph II alleged that defendant "did wilfully and unlawfully by means of force and fear" take from Rothenberg money, in violation of section 211. At the request of the public defender who was representing defendant, the court appointed a psychiatrist to determine whether a plea of guilty by reason of insanity was appropriate or whether defendant had diminished capacity. On February 13, 1969, defendant denied all the allegations in the petition.

On March 6, 1969, a juvenile court referee conducted the adjudicatory hearing at which the deputy district attorney called eight witnesses and introduced numerous exhibits. Over codefendant Bert Gonzales's objection, the hearing was treated as a civil rather than criminal matter, thus making the standard of beyond a reasonable doubt inapplicable. The next day, defendant's counsel informed the referee that defendant was willing to admit to a violation of former section 192, subdivision 2 (involuntary manslaughter), in exchange for dismissal of paragraphs I and II of the petition. (See Stats. 1945, ch. 1006, § 1, p. 1942.) Opposing the dismissal of any allegations, the deputy district attorney proffered evidence that defendant had confessed to stabbing Rothenberg repeatedly, to planning the robbery in advance, and to taking money from Rothenberg. Ultimately, the referee ruled that "justice would dictate under present circumstances" deleting the malice aforethought allegation.

After defendant admitted he took part in the stabbing of Rothenberg, the referee accepted defendant's admission, dismissed the more serious allegations of paragraphs I and II, and amended the petition to allege involuntary manslaughter as follows: "PARAGRAPH III: that said minor, on or about February 7, 1969, in the commission of an unlawful act killed Allen Howard Rothenberg, thereby violating Section 292.2 [*sic* —former section 192, subdivision 2, now section 192,

17

subdivision (b)] of the Penal Code."  In his March 7, 1969 "Findings and Order," the referee explained he relied on the probation officer's report that defendant had a "history of mental and brain problems plus a long record of delinquent behavior not highlighted by assaultive behavior," and the fact that defendant had only recently turned 16 when he committed the crime.  In sustaining the petition, the referee recommended that defendant be recommitted to the California Youth Authority.

Another juvenile court judge, however, ordered a de novo rehearing of the referee's adjudication.  (See Welf. & Inst. Code, former § 559, added by Stats. 1961, ch. 1616, § 2, p. 3467 and repealed by Stats. 1976, ch. 1068, § 17, p. 4781.) At the April 7, 1969 rehearing before yet another judge, the court considered the transcripts from the March 6 and March 7, 1969 hearings, and the parties presented additional evidence, including defendant's testimony.  This time around, the court found the murder and robbery allegations in the petition to be true.  On May 14, 1969, defendant was found not fit for juvenile court, his section 602 petition was dismissed, and he was ordered prosecuted as an adult.

On February 1, 1971, almost two years after the section 602 petition was first filed against defendant, he pleaded guilty to second degree murder in superior court.

### b.  Legal principles

Welfare and Institutions Code section 602 "extends juvenile court jurisdiction to persons who are under 18 years of age when they violate any law 'defining crime.' (§ 602, subd. (a).)"  (*In re Eddie M.* (2003) 31 Cal.4th 480, 486.) Under present law, on the People's motion "made prior to the attachment of jeopardy," a juvenile court may in its discretion determine that the minor is unfit for treatment in juvenile court and should be tried instead in criminal court.  (Welf.

& Inst. Code, §707, subd. (a)(1) [referred to as a fitness or transfer hearing].) If a minor is found fit for juvenile court treatment, the court next determines at an adjudicatory or jurisdictional hearing whether a crime has been committed. (See *In re Greg F.* (2012) 55 Cal.4th 393, 403; § 701.) Any offense alleged in the section 602 petition must be proven true "beyond a reasonable doubt" and be "supported by evidence, legally admissible in the trial of criminal cases." (§ 701; see *In re Eddie M.*, *supra*, 31 Cal.4th at p. 487; *In re Greg F.*, *supra*, 55 Cal.4th at p. 403.) Once the court sustains a section 602 petition and finds jurisdiction, the court conducts a dispositional hearing at which it considers the probation officer's social study report and other evidence in determining the appropriate disposition for the minor. (Welf. & Inst. Code, § 702; see *In re Greg F.*, *supra*, 55 Cal.4th at p. 404; *In re Eddie M.*, *supra*, 31 Cal.4th at p. 487 ["Less exacting rules govern disposition."].)

As relevant here, at the time of defendant's 1969 juvenile adjudication, Welfare and Institutions Code former section 707 provided that a juvenile court could determine — "[a]t any time during" the hearing — that the minor is not fit to be treated as a juvenile and should be transferred to an adult court. (Welf. & Inst. Code, former § 707, as amended by Stats. 1967, ch. 1357, § 1, p. 3197; see *Barker v. Estelle* (9th Cir. 1989) 913 F.2d 1433, 1439-1440.) In 1975, the high court examined this statutory scheme and unanimously held that jeopardy attached at the adjudicatory hearing, which it described as "a proceeding whose object is to determine whether [the juvenile] has committed criminal acts that violate a criminal law and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years." (*Breed*, *supra*, 421 U.S. at p. 529; *id.* at p. 531 ["Jeopardy attached . . . when the Juvenile Court, as the trier of the facts, began to hear evidence."].)

19

Although a finding of unfitness and the ensuing transfer to an adult court could occur not only after, but also before, an adjudication of guilt (see Welf. & Inst. Code, former § 707, as amended by Stats. 1967, ch. 1357, § 1, p. 3197), the *risk* of adjudication itself was enough for jeopardy to attach. (*Breed*, *supra*, 421 U.S. at p. 531 [analyzing an "aspect of the juvenile-court system in terms of the kind of risk to which jeopardy refers"]; see *Barker v. Estelle*, *supra*, 913 F.2d at p. 1439.) As such, the high court emphasized that any decision to transfer a juvenile to adult court should be made *prior to* an adjudicatory proceeding. (*Breed*, *supra*, 421 U.S. at pp. 536-538 & fn. 18.) In response, our Legislature repealed and reenacted Welfare and Institutions Code section 707 to conform to the requirements of the high court's decision. (See Stats. 1975, ch. 1266, § 4, p. 3325; see *Barker v. Estelle*, *supra*, 913 F.2d at pp. 1439-1440.)

### c. *Forfeiture*

At the outset, we address whether defendant has forfeited the double jeopardy issue. As noted above, defendant's motion to strike the 1971 conviction rested mainly on his *Boykin/Tahl* claim. However, at the August 10, 1999, evidentiary hearing on defendant's motion, defense counsel asked the original deputy district attorney, John Breault, who had prosecuted defendant in adult court, whether he remembered if defendant's previous attorney had argued in 1971 that the proceeding in adult court was in violation of double jeopardy. Breault testified that he did remember, and that he had countered that jeopardy did not attach because it was a juvenile proceeding.

Despite initiating the questions on double jeopardy himself, defense counsel did not move to strike the prior conviction on double jeopardy grounds, and we see no possible tactical reason for counsel not to have done so. (See *People v. Jones* (1994) 24 Cal.App.4th 1780, 1783, fn. 5.) We have previously

20

considered a double jeopardy issue on appeal that was technically not cognizable because a meritorious double jeopardy defense relates to a defendant's claim of ineffective assistance of counsel. (*People v. Scott* (1997) 15 Cal.4th 1188, 1201; *People v. Marshall* (1996) 13 Cal.4th 799, 824, fn. 1.) We will therefore address the merits of this claim. Before discussing the claim's substance, however, we must consider possible procedural hurdles relating to the retroactivity of *Breed*, *supra*, 421 U.S. 519, and the collateral challenge to a prior judgment.

### d. Retroactivity

Defendant asserts that although *Breed* was decided after his 1971 conviction, its holding applies retroactively because he was subject to the very statute that the high court effectively invalidated. We agree. As we explain, this conclusion is compelled by two lines of cases — *In re Bryan* (1976) 16 Cal.3d 782, which dealt specifically with the retroactivity of *Breed*, and *People v. Horton* (1995) 11 Cal.4th 1068, 1139-1140 (*Horton*), which involved striking a constitutionally invalid prior conviction alleged as the basis for a special circumstance.

In *In re Bryan*, the issue was whether the 1975 holding in *Breed* applied retroactively to the defendant's juvenile adjudicatory hearing held in 1971. In concluding that it did, we declined to apply the three-pronged analysis for retroactivity of constitutional rules of criminal procedure under *Linkletter v. Walker* (1965) 381 U.S. 618. We noted: " 'The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial.' " (*In re Bryan*, *supra*, 16 Cal.3d at p. 786, quoting

21

*Robinson v. Neil* (1973) 409 U.S. 505, 509 [applying new rule retroactively because old rule violated double jeopardy; court lacked authority to try defendant].)  We found it unnecessary to apply the *Linkletter* test "in the case of a decision compelled by constitutional prohibitions against multiple jeopardy."  (*In re Bryan*, *supra*, 16 Cal.3d at p. 787.)  "*Breed* is thus to be given retrospective application."  (*Ibid*.)

The Attorney General's attempt to distinguish *In re Bryan* is unpersuasive.  She primarily relies on *Griffith v. Kentucky* (1987) 479 U.S. 314, 328, in which the high court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or *not yet final*, with no exception for cases in which the new rule constitutes a 'clear break' with the past."  (Italics added.)  The Attorney General evidently reasons that the phrase "not yet final" embraces an implied holding or negative inference that such rules do not apply retroactively to decisions that *are* final.  Based on this reading of *Griffith v. Kentucky*, the Attorney General argues that because defendant's 1971 conviction was already final at the time the high court decided *Breed*, the "new rule" in *Breed* could not be applied retroactively to defendant's case.  Her reliance on *Griffith v. Kentucky* is misplaced.

In *Griffith v. Kentucky*, the high court held that new rules of criminal procedure *always* apply to cases that are not yet final.   It "rejected as unprincipled and inequitable the *Linkletter* standard for cases pending on direct review at the time a new rule is announced."  (*Teague v. Lane* (1989) 489 U.S. 288, 304.)  Contrary to the Attorney General's contention, the court expressed no view in *Griffith v. Kentucky* on whether such rules apply retroactively to cases that are already final.  (*Griffith v. Kentucky*, *supra*, 479 U.S. at p. 329 (conc. opn. of Powell, J.) [retroactivity question regarding habeas corpus petitions is "carefully

left open"].)  It addressed that question of collateral review in *Teague v. Lane*, *supra*, 489 U.S. 288.

In *Teague v. Lane*, the high court concluded that new rules of criminal procedure do not ordinarily apply retroactively to cases "which have become final before the new rules are announced."  (*Teague v. Lane*, *supra*, 489 U.S. at p. 310.)  However, a new rule may be given retroactive effect if:  (1) the rule is, in fact, "substantive," or (2) it is " 'a watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."  (*Schriro v. Summerlin* (2004) 542 U.S. 348, 351-352, italics omitted; *Teague v. Lane*, *supra*, 489 U.S. at p. 311.)  The Attorney General did not refer to *Teague v. Lane*'s nonretroactivity principle, and, as such, she did not address whether the rule announced in *Breed* falls within either exception.  We conclude that *Breed*'s double jeopardy rule is substantive in nature, and that *Teague v. Lane* poses no bar to applying *Breed* retroactively to cases on collateral review.  (*Schriro v. Summerlin*, *supra*, 542 U.S. at p. 352, fn. 4 [rules falling under *Teague v. Lane*'s first exception "are more accurately characterized as substantive rules not subject to the bar"].)

As noted above, the " 'practical result' " of the guarantee against double jeopardy " 'is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial.' "  (*In re Bryan*, *supra*, 16 Cal.3d at p. 786, quoting *Robinson v. Neil*, *supra*, 409 U.S. at p. 509; see *United States v. Johnson* (1982) 457 U.S. 537, 550 ["the Court has recognized full retroactivity as a necessary adjunct to a ruling that a trial court lacked authority to convict or punish a criminal defendant in the first place"].)  Using the high court's rationale, it seems fair to characterize *Breed*'s double jeopardy rule as more substantive than procedural because without the rule's retroactive application, a defendant would otherwise "face[] a punishment that the law cannot impose upon

23

him." (*Schriro v. Summerlin*, *supra,* 542 U.S. at p. 352.)  In short, we reject the Attorney General's argument that the retroactivity rule set out *In re Bryan* must be reconsidered in light of relevant high court decisions.

Nevertheless, the Attorney General maintains that even if *In re Bryan* remains good law, a violation of the constitutional double jeopardy protection may not form the basis of a motion to strike a prior murder conviction in a capital case. Such a motion, according to the Attorney General, may only be based on certain "*fundamental* constitutional flaws." (*Horton*, *supra*, 11 Cal.4th at p. 1135.)  She suggests that *In re Reno* (2012) 55 Cal.4th 428, in which the defendant failed to show his double jeopardy challenge involved a fundamental constitutional error, compels us to conclude that a double jeopardy violation is not the type of fundamental constitutional violation that may be asserted in such a motion.  Not so.

*In re Reno* dealt with specific procedural issues when a habeas corpus petitioner collaterally attacks his final conviction and "has reraised *all* prior appellate claims *en masse*." (*In re Reno*, *supra*, 55 Cal.4th at p. 485.)  Regarding the petitioner's double jeopardy claim which was resolved against him on direct appeal, we concluded it was procedurally barred under *In re Waltreus* (1965) 62 Cal.2d 218, 225.  The petitioner, we found, failed "to *allege any facts* suggesting the double jeopardy issue falls within" *Waltreus*'s narrow exception that the issue "involves a fundamental constitutional error." (*In re Reno*, *supra*, 55 Cal.4th at p. 481, italics added; *id*. at p. 486 ["we ascribe no weight to these assertions, unadorned as they are by factual allegations or legal argument"].)  We also pointed out that the petitioner failed to allege facts or present argument on why his "renewed double jeopardy claim" constituted a structural defect not susceptible to harmless error review.  (*Id*. at p. 487.)  Thus, contrary to the Attorney General's assertion, our holding in *In re Reno*, which dealt specifically with the deficient

allegations in that case, did not suggest that a double jeopardy violation does not qualify as a fundamental constitutional flaw as a matter of law. (See *id.* at pp. 486-487; see *People v. Sumstine* (1984) 36 Cal.3d 909, 917 [suggesting defendant "may bring *any* challenge that undermines the constitutional basis of his prior conviction" (italics added)].)

We recognize that unlike *In re Bryan*, where the defendant sought relief by writ of habeas corpus, defendant here collaterally attacks his prior conviction by way of a pretrial motion to strike. This distinction, however, strengthens our conclusion that defendant was permitted to make such a challenge here. Unlike a writ of habeas corpus, a motion to strike does not seek to vacate or extinguish the underlying conviction, which would in turn trigger procedural bars. (*Horton*, *supra*, 11 Cal.4th at p. 1138.) "The purpose of a motion to strike is to challenge only the present effect of the prior conviction." (*People v. Sumstine*, *supra*, 36 Cal.3d at p. 921.) Significantly, the collateral challenge here is to a prior conviction alleged as a basis for a *death-qualifying special circumstance.* (See *Horton*, *supra*, 11 Cal.4th at pp. 1137-1138 [procedural bars do not apply to collateral attacks on prior convictions underlying special-circumstance allegations].) "In the capital context, a defendant almost invariably will face much graver consequences from the use of the prior conviction, as a predicate for a special-circumstance finding, than he or she faced in the earlier criminal proceeding; it is because of those grave consequences, of course, that a defendant has been accorded special procedural protections and assistance in a capital case. In many instances, it may be unfair — and inconsistent with the special need for reliability — to deprive a defendant of the right to demonstrate the invalidity of the prior conviction in the subsequent capital prosecution simply because in the prior proceeding, when much less may have been at stake and the defendant may

25

not have been accorded the same procedural protections, defendant did not prevail on the issue." (*Id*. at p. 1138.)

For all these reasons, we conclude that defendant may collaterally challenge his 1971 second degree murder conviction.

### e. Merits

Turning to the substance of this claim, it is clear that based on *Breed*'s retroactive application, defendant's 1971 second degree murder conviction was obtained in violation of the double jeopardy clause. (U.S. Const., 5th, 14th Amends.; Cal. Const., art. I, § 15.) Defendant was placed once in jeopardy at the adjudicatory juvenile hearing before the referee, and once again, when he was prosecuted for the same offense in adult court where he pleaded guilty. (*Breed*, *supra*, 421 U.S. at p. 541 ["We hold that the prosecution of respondent in Superior Court, after an adjudicatory proceeding in Juvenile Court, violated the Double Jeopardy Clause . . . ."].) Because the prior conviction's constitutional deficiency is apparent from the record, thus making it unnecessary for us to remand for a hearing, we must set aside this special-circumstance finding (§ 190.2, subd. (a)(2)). (See *Horton*, *supra*, 11 Cal.4th at pp. 1139-1140 [declining to remand for new hearing on motion to strike prior conviction].)[7]

Nonetheless, we will not disturb the death judgment unless defendant can show prejudice. (See *Horton*, *supra*, 11 Cal.4th at p. 1140.) Although the death judgment here was also supported by the multiple murder special-circumstance finding, we conclude below that special-circumstance-allegation finding must also

---

[7] In a separate claim, which is addressed below, defendant also argues that this 1971 conviction was improperly used to impeach his trial testimony and, as such, his conviction for the Facundo murder should be overturned as well.

26

be set aside.  (See *post*, at p. 34.)  Consequently, without either special-circumstance finding, we must reverse the penalty judgment.

### 2. *The prosecution's refiling of the Apodaca murder charge*

Defendant argues that the trial court erred by allowing the prosecution to refile the Apodaca murder charge, which he contends had been previously dismissed three times.  (See § 1387 [two-dismissal rule for refiling charges of certain violent felonies].)  He asserts that even if the murder charge had been dismissed only twice, the court retroactively applied section 1387.1 — which became effective January 1, 1988 to allow for a third filing in the case of excusable neglect — in violation of the ex post facto clauses of both the state and federal Constitutions.  (See U.S. Const., art. I, § 10; Cal. Const., art. I, § 9; see *John L. v. Superior Court* (2004) 33 Cal.4th 158, 171-172 (*John L.*) [federal and state ex post facto clauses are similarly construed].)  He further argues that the multiple murder special circumstance should be vacated because it is based in part on the invalid second degree murder conviction for the death of Apodaca.  For reasons that follow, we agree with defendant.

### a. *Procedural history*

The facts of Apodaca's killing are discussed above.  (See *ante*, at pp. 6-9.)  As relevant here, Apodaca was killed on January 23, 1987.  On February 5, 1987, the People charged both defendant and Jesse Salazar for the first degree murder of Apodaca (case No. A795989).  (§ 187, subd. (a).)  As to defendant, the felony complaint alleged a prior murder special circumstance (§ 190.2, subd. (a)(2)), based on his 1971 conviction for the second degree murder of Allen Rothenberg.  As to Salazar, the complaint also charged him with the September 1985 murder of another man, Ronald Eugene Diaz.  In light of the prosecution's inability to locate

27

crucial witnesses, the warrant was recalled and the case was dismissed as to defendant on March 13, 1987.

On March 25, 1987, the People refiled the first degree murder charge with the prior murder special-circumstance allegation against defendant (case No. A798706). At the April 8, 1987, preliminary hearing, the only eyewitness to Apodaca's stabbing death, Robert De Alva, failed to appear. He had apparently not been properly served with a subpoena necessary to procure an arrest warrant. The magistrate declined to find good cause for a continuance, but permitted the prosecution to proceed while it looked for De Alva. The prosecution next called Richard Rivera, the owner of the upholstery shop where Apodaca was killed, who testified he did not see the stabbing happen, but only saw Apodaca lying on the floor afterwards. Later at the hearing, the pathologist who performed the autopsy of Apodaca, Dr. Sara Reddy, testified that the cause of death was a stab wound to the chest. She also opined that Apodaca suffered from a superficial neck wound that was "most likely" caused by a different instrument.

The following day, April 9, the prosecution advised the court that it could not locate De Alva. After questioning whether there was a showing of malice to support the murder charge against defendant, the magistrate held defendant to answer for the lesser offense of manslaughter. On April 24, 1987, the prosecution refiled the information under section 739, charging defendant with murder under the previous case number, A798706, but the information did not include a special-circumstance allegation. Ultimately, on June 23, 1987, the trial court granted defendant's motion to dismiss the information under section 1382 after the prosecution advised that it still could not locate De Alva.

More than a decade later, on June 1, 1998, the prosecution filed a three-count felony complaint, charging defendant in count 2 with the first degree murder of Apodaca and alleging special circumstances of multiple murder and prior

28

murder.  The following year, on July 27, 1999, defendant filed a motion to dismiss the Apodaca murder charge, contending that the prosecution had exceeded the number of refilings permitted under section 1387.  The prosecution conceded that there were two dismissals of the Apodaca murder charge.  However, it argued that the third refiling was permissible under section 1387.1, and that there was a showing of excusable neglect.  Defendant, however, countered that because section 1387.1 became effective *after* the Apodaca murder charge was dismissed for a second time in June 1987, section 1387's two-dismissal rule governed and precluded any additional refiling.  Otherwise, to allow the prosecution to refile the murder charge a decade later in 1998 would amount to a retroactive application of section 1387.1 in violation of the ex post facto clause.

Before ruling on these issues, the trial court held a hearing in August 1999 to determine whether the prior dismissals were due to the prosecution's "excusable neglect."  (§ 1387.1.)  The original prosecutor, detective, and investigator on the Apodaca murder case each testified that despite their efforts, they could not locate eyewitness De Alva in 1987.  The trial court found that the prosecution had shown excusable neglect under section 1387.1.  Defendant alternatively argued that section 1387.1 was not applicable in the first place because there had been *three* prior dismissals of the Apodaca murder charge:  the dismissal of the February 5, 1987, complaint on March 13, 1987; the reduction of the murder charge to manslaughter in the March 25, 1987, complaint on April 9, 1987; and the dismissal of the April 24, 1987, complaint on June 23, 1987.  The trial court, however, agreed with the prosecution that because defendant was held over on the lesser necessarily included offense of manslaughter, the magistrate's refusal to hold defendant for murder did *not* count as a dismissal for purposes of section 1387.   In denying defendant's motion to dismiss, the trial court noted that its

29

ruling included an implicit finding that section 1387.1 applied retroactively and did not violate the ex post facto clause.

Both the Court of Appeal and this court, respectively, denied defendant's writ of prohibition and petition for review. The jury subsequently convicted defendant of second degree murder. Defendant renews these claims on appeal.

### b. Legal principles

Under section 1387, felony prosecutions are generally "subject to a two-dismissal rule; two previous dismissals of charges for the same offense will bar a new felony charge." (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1019.) Put another way, section 1387 allows for only one previous termination or dismissal of a felony. (*People v. Superior Court* (*Martinez*) (1993) 19 Cal.App.4th 738, 745.) The Attorney General does not dispute that section 1387 would have prohibited the 1998 refiling of the Apodaca murder charge, which was dismissed twice in 1987. The point of contention involves section 1387.1, which was enacted in 1987 and became effective January 1, 1988. It provides an exception to the "two-dismissal rule": it permits the prosecution to file a violent felony charge a third time if either of the prior dismissals were due to "excusable neglect," and the prosecution did not act in "bad faith." (*Ibid.*; see *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 739.) The question here is whether by allowing the third filing of Apodaca's murder charge, the trial court applied section 1387.1 retroactively in violation of the ex post facto clause.

Although the Latin term "ex post facto" literally extends to any statute passed " 'after the fact' " (*Collins v. Youngblood* (1990) 497 U.S. 37, 41), "no statute falls within the ex post facto prohibition unless 'two critical elements' exist." (*John L.*, *supra*, 33 Cal.4th at p. 172.) The statute must be retroactive, and must implicate at least one of the four categories described in *Calder v. Bull*

30

(1798) 3 U.S. (3 Dall.) 386, 390. (*John L.*, *supra*, 33 Cal.4th at p. 172.) To be considered retroactive, the law must " 'change[] the legal consequences of an act completed before [the law's] effective date,' namely the defendant's criminal behavior." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 288; accord, *John L.*, *supra*, 33 Cal.4th at p. 172.) "In other words, the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is criminal conduct committed before the disputed law took effect." (*Ibid.*) As to the second element, the four *Calder* categories encompass laws that (1) criminalize conduct that was innocent when done; (2) aggravate or make greater a crime than when committed; (3) change and increase the punishment; and (4) alter the rules of evidence to reduce the legal sufficiency necessary to support a finding of guilt. (See *Calder*, *supra*, 3 U.S. (3 Dall.) at p. 390; *People v. Brown* (2004) 33 Cal.4th 382, 391.)

### c. Application

As discussed, the parties agree that after the Apodaca murder charge was dismissed a second time in June 1987, section 1387's two-dismissal rule barred any additional refiling. The Attorney General, however, argues that the subsequent enactment of section 1387.1 permitted defendant's prosecution for the same offense 10 years later. Defendant counters that this third refiling in 1998 would amount to a retroactive application of section 1387.1 in violation of the federal Constitution's ex post facto clause. Relying on *Stogner v. California* (2003) 539 U.S. 607 (*Stogner*), defendant argues that section 1387 "operates precisely like a statute of limitations," and that by allowing the prosecution to refile a third time under section 1387.1, the trial court unconstitutionally revived an otherwise barred prosecution. We conclude that because a retroactive construction of section 1387.1 would violate the ex post facto clause, the statute

31

does not apply to cases that were twice dismissed before it was enacted. (*Rust v. Sullivan* (1991) 500 U.S. 173, 190 [a statute " 'ought not be construed to violate the Constitution if any other possible construction remains available' "].)

In *Stogner*, the high court majority held that a California statute extending the limitations period for previously time-barred prosecutions "falls within the literal terms" of the second *Calder* category, i.e., a " 'law that aggravates a crime, or makes it greater than it was, when committed.' " (*Stogner*, *supra*, 530 U.S. at pp. 615, 613, italics omitted.) First explaining that this category's alternate description refers to a statute "that 'inflicts punishments where the party was not, by law, liable to any punishment,' " the high court articulated why this second category fit: "After (but not before) the original statute of limitations had expired, a party such as Stogner was not 'liable to any punishment.' California's new statute therefore 'aggravated' Stogner's alleged crime, or made it 'greater than it was, when committed,' in the sense that, and to the extent that, it 'inflicted punishment' for past criminal conduct that (when the new law was enacted) did not trigger any such liability." (*Id*. at p. 613, italics omitted.) Likewise, because defendant here was not by law liable for the twice-dismissed murder charges when section 1387.1 became effective, any application of section 1387.1 would make his crime " 'greater than it was, when committed' " in violation of the ex post facto clause. (*Stogner*, *supra*, 539 U.S. at p. 613; *id*. at pp. 613-614 [second *Calder* category applies "where a new law inflicts a punishment upon a person not then subject to that punishment, to any degree"].)

Seeking to distinguish *Stogner*, the Attorney General emphasizes that there is no statute of limitations on murder and an action "may be commenced at any time." (§ 799; see *People v. Nelson* (2008) 43 Cal.4th 1242, 1250.) Because section 1387 cannot provide a defendant charged with murder "amnesty" or a "complete defense to prosecution" (*Stogner*, *supra*, 539 U.S. at p. 632), the

passage of section 1387.1 as an exception to section 1387 would not unconstitutionally "revive a long-forbidden prosecution." (*Stogner*, *supra*, 539 U.S. at p. 632.) The Attorney General adds that the application of section 1387.1 is not contingent on time and is thus "completely unrelated" to a statute of limitations; it merely provides a procedural remedial tool to avoid releasing dangerous felons. (See *People v. Massey* (2000) 79 Cal.App.4th 204, 211.) We are not persuaded. (See *Collins v. Youngblood*, *supra*, 497 U.S. at p. 46 ["by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause"].)

Though the twice-dismissed action against defendant was not *time*-barred under section 1387, it was nevertheless barred when section 1387.1 was enacted. Under *Stogner*, what matters is the government's attempt "to revive a long-forbidden prosecution," which the high court described as implicating a "predominating constitutional interest." (*Stogner*, *supra*, 539 U.S. at p. 632, italics added; *id*. at p. 611 [unfairness where "government has refused 'to play by its own rules' "].) If section 1387.1 permitted a third refiling of the Apodaca murder charge, it would "retroactively withdraw[] a complete defense to prosecution after it ha[d] already attached, and it [would do] so in a manner that allow[ed] the State to withdraw this defense at will and with respect to individuals already identified. [Citation.] 'Unfair' seems to us a fair characterization." (*Stogner*, *supra*, 539 U.S. at p. 632.) We therefore construe section 1387.1 as not applying retroactively to revive prosecutions that were barred by section 1387 when it was enacted. As a result, the 1998 refiling of the Apodaca murder charge was improper.[8]

---

[8]    Given this conclusion, it is unnecessary to decide whether the Apodaca murder charge was dismissed twice, as the Attorney General suggests, or three

*(footnote continued on next page)*

Given that defendant was improperly charged and subsequently convicted of Apodaca's murder, we must reverse the judgment of conviction for second degree murder, set aside the jury's true finding regarding the multiple murder special circumstance, and, finally, reverse the judgment of death. Nevertheless, we will discuss defendant's additional arguments to the extent they challenge the validity of his convictions for robbery and the first degree murder of Facundo. (See *People v. Brents* (2012) 53 Cal.4th 599, 614.)

### 3. *Trial court's refusal to sever the murder charges from the robbery charge*

Before trial, defendant also moved to sever the two murder charges (count 1 [victim Facundo]; count 2 [victim Apodaca]) from the unrelated robbery charge (count 3 [Spartan Burgers restaurant]). Defendant alleged that the robbery, which occurred more than a decade after the murders of Facundo and Apodaca, had nothing in common with them. Further, while the evidence that defendant committed the robbery was "overwhelming," the evidence that he committed the two murders, in particular, the murder of Apodaca, was not. Although the prosecution conceded that the evidence regarding the robbery would not otherwise be cross-admissible in either murder trial, it argued there was "no real prejudice" if the robbery count were not severed. The trial court denied defendant's motion to sever, finding that joinder "would not rise to the level of serious prejudice." On appeal, defendant argues that the trial court's refusal to sever the unrelated robbery charge denied him a fair trial by improperly bolstering the prosecution's weak

---

*(footnote continued from previous page)*

times, as defendant argues, or whether the prosecution made the requisite showing of "excusable neglect" under section 1387.1.

evidence of intent on both murder charges. (U.S. Const., 5th, 8th and 14th Amends.; Cal. Const., art. I, §§ 15, 16.) For reasons that follow, we disagree.

As relevant here, section 954 permits the joinder of "two or more different offenses of the same class of crimes or offenses." (§ 954; see *People v. Soper* (2009) 45 Cal.4th 759, 771.) "[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by law." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.) However, a trial court in its discretion may order the offenses to be severed "in the interests of justice and for good cause shown." (§ 954.)

The often-cited factors for severance are: "(1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether some of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*People v. Elliott* (2012) 53 Cal.4th 535, 551.) If cross-admissibility of the evidence is present, that is normally enough to justify the trial court's refusal to sever the charged offenses. (*Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1227.) However, the lack of cross-admissibility is not necessarily dispositive for purposes of severance. (*People v. Ramirez* (2006) 39 Cal.4th 398, 440; see § 954.1.) If there is no cross-admissibility of the evidence, we evaluate the three remaining factors to determine whether they demonstrate the trial court's abuse of discretion. (*Alcala v. Superior Court, supra*, 43 Cal.4th at p. 1227.)

For purposes of section 954, "[r]obbery and murder are the same class of crime [because] both involve a common element of assault on the victim." (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243.) Because the statutory requirement for joinder was met, defendant can only establish error based on the

35

trial court's abuse of discretion, in other words, defendant must make a " 'clear showing of prejudice.' " (*People v. Ramirez, supra*, 39 Cal.4th at p. 439; *Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1220 [abuse of discretion if the court's ruling falls outside the bounds of reason].) "We review the trial court's exercise of discretion in light of the record before it when it ruled." (*People v. Elliott*, *supra*, 53 Cal.4th at p. 552.) In the end, even if a trial court's ruling on a motion to sever was proper at the time it was made, we must still determine whether the joinder of charges resulted in " 'gross unfairness depriving the defendant of due process of law.' " (*People v. Soper*, *supra*, 45 Cal.4th at p. 783.)

As the prosecution conceded at trial, evidence of the robbery would not have been cross-admissible with evidence of either murder. However, we conclude that consideration of the other three factors do not demonstrate a " 'clear showing of prejudice' " based on the joinder of the robbery charge and the Facundo murder charge, of which defendant stands convicted. (*People v. Ramirez, supra*, 39 Cal.4th at p. 439.)

In support of severance, defendant argues that the robbery of Spartan Burgers was more inflammatory than the Facundo murder because the robbery involved the use of a *gun* against a *stranger*. We disagree. Though it is debatable whether a gun or a knife is a more dangerous weapon or whether the perpetrator being a stranger or an acquaintance engenders more fear, defendant's robbery of Spartan Burgers, significantly, did not involve any bodily injury. In stark contrast, defendant brutally stabbed Facundo during his attack. Also, contrary to defendant's contention, evidence of the robbery did not bolster the "weak" Facundo murder case with respect to the issue of defendant's intent. Evidence that defendant committed the murder was anything but weak. Though defendant flatly denied robbing Spartan Burgers at trial, he confessed both before trial and on the stand to killing Facundo. (See *ante*, at pp. 11-12.) As to the forensic evidence, the

36

pathologist testified that all of Facundo's major stab wounds were "lethal." As the Attorney General contends, the location and number of wounds support defendant's intent to kill his victim.. (See *People v. Silva* (1953) 41 Cal.2d 778, 782 ["The extent and location of a knife wound are pertinent to a determination of the intent with which it was inflicted."].)

Because we are reversing the penalty judgment, the factor whether joinder of the charges converted defendant's case from a noncapital case to a capital one is no longer relevant in determining whether defendant suffered prejudice. Based on the foregoing, we conclude that defendant has not made a clear showing of prejudice based on the trial court's refusal to sever.

In the end, nothing suggests that the joinder of the robbery charge to the murder charges resulted in " 'gross unfairness' " depriving defendant of due process of the law. (*People v. Soper*, *supra*, 45 Cal.4th at p. 783.) Contrary to defendant's suggestion, with respect to this severance issue, "a heightened analysis is no longer called for" in capital cases. (*Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1229, fn. 19; see § 790, subd. (b).)

### 4. *Trial court's "revocation" of defendant's pro. per. status*

Defendant claims that the trial court improperly terminated his in propria persona status by relying on defendant's loss of library privileges in jail and the seriousness of the charges against him as grounds for revocation. Alternatively, he maintains that he did not "validly" sign the substitution of attorney form because he misunderstood that the loss of library privileges would inevitably lead to such revocation, and the trial court should have corrected his misapprehension of the law. For reasons that follow, we find this claim meritless.

After appearing in propria persona at his September 1998 preliminary hearing, defendant informed the trial court at his arraignment that he wished to

37

continue in propria persona. In reviewing his formal request, the trial court noted that defendant had represented himself in three 1976 cases involving robbery, attempted robbery, and assault with deadly weapon charges, and that he had been convicted in two cases and acquitted in one. After the trial court explained the difficulties and dangers of defendant representing himself, defendant confirmed he wished to proceed in propria persona despite facing the death penalty. He, however, requested that the court appoint advisory or standby counsel.[9] The trial court granted defendant's petition for in propria persona status at the October 13, 1998, arraignment hearing. The written petition included the statement, "I understand that misconduct occurring outside of court may result in restriction or termination of Pro Per privileges or my Pro Per status," which defendant initialed.

With Attorney Andrew Stein as advisory counsel, defendant continued to represent himself at pretrial hearings until November 1998, when his in-custody in propria persona privileges at the Los Angeles County jail were revoked. A search of defendant's cell had yielded items from the law library, 750 milligrams of the drug methocarbamol, and a black ballpoint pen, the possession of which violated jail rules. On December 3, 1998, defendant appeared in court with Attorney Stein after signing a substitution of attorney form. Stein informed the court that defendant told him he was willing to relinquish his in propria persona status. Defendant added: "Involuntarily, by the way." Defendant explained that he said

---

[9] The roles of advisory counsel and standby counsel are distinct. (See *People v. Blair* (2005) 36 Cal.4th 686, 725.) The parties and the court used both terms to describe Attorney Stein, though it appears Stein was to serve as advisory counsel. (*Ibid.* [advisory counsel "is appointed to assist the self-represented defendant if and when the defendant requests help"].) In any event, the distinction between advisory and standby counsel is not crucial to this issue. (See *People v. Butler* (2009) 47 Cal.4th 814, 828, fn. 6 [defense counsel served in *both* advisory and standby capacities].)

"involuntarily because I've been told by numerous people that today my pro per status was going to be revoked regardless of what transpires today." Alleging that the Sheriff's Department was not treating him fairly, defendant claimed he would not get a fair trial representing himself and that "my only recourse is to give up my pro per status and go with Mr. Stein."

Insisting on making an appropriate record, the prosecution emphasized that even though defendant had lost his library privileges, this did not mean he could not remain in propria persona and that Stein, as advisory counsel, could supply any needed research material. The prosecution, however, added: "Obviously, obviously, the appropriate choice to make on behalf of the defendant is to have a lawyer represent him because it is a death penalty case." When the trial court asked defendant if he had signed the substitution form voluntarily and if he understood what the form meant, defendant replied yes to both questions.

Attorney Stein agreed with the prosecution that it was in defendant's best interest to be represented by counsel and asserted that "without me as his attorney or without an attorney, Mr. Trujeque would try to do what Penal Code section 1018 prohibits him from doing, which is tantamount to pleading guilty to the death penalty." He added: "Even with advisory counsel, in a death penalty case when you don't have access to the law library, you're really not in a very good position." Attorney Stein informed the court he had talked to defendant at length about the substitution of attorney form and believed defendant signed it "intelligently, knowingly, and voluntarily."

However, when the prosecution later asked defendant what he wanted to do, he said: "I want to represent myself and have access and be allowed to have access to the law library." After defendant conferred with Attorney Stein off the record, Stein said "I think the court already said they've accepted the substitution of attorney." The prosecution, who was "not happy with the record," asked that

39

the court make a ruling on the substitution of attorney, noting that documents submitted "indicate that his pro per status should be, in fact, withdrawn from privileges at the county jail." After recounting why defendant's in-custody in propria persona privileges had been revoked for cause, the court noted it had inquired and confirmed that defendant did not sign the substitution of attorney form out of duress or force. It accepted the form "[b]ased on the seriousness of the charges, [and] the fact that a substitution of attorney was voluntarily and willingly signed." On appeal, defendant claims the trial court erroneously revoked his in propria persona status in violation of the Sixth and Fourteenth Amendments. (U.S. Const., 6th & 14th Amends; see *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).)

Under *Faretta*, a defendant "must be free personally to decide whether in his particular case counsel is to his advantage," even though "he may conduct his own defense ultimately to his own detriment." (*Faretta*, *supra*, 422 U.S. at p. 834.) This right to self-representation extends to capital prosecutions. (*People v. Elliott*, *supra*, 53 Cal.4th at p. 592.) However, the right "once asserted, may be waived or abandoned." (*People v. Dunkle* (2005) 36 Cal.4th 861, 909; see *Indiana v. Edwards* (2008) 554 U.S. 164, 171 [self-representation right is not absolute].) A defendant's waiver or abandonment of this constitutional right should be voluntary, knowing, and intelligent (*People v. D'Arcy* (2010) 48 Cal.4th 257, 284); such waiver or abandonment may be inferred from a defendant's conduct. (*Id.* at pp. 284-285; *People v. Stanley* (2006) 39 Cal.4th 913, 929; *People v. Dunkle*, *supra*, 36 Cal.4th at p. 909.) A trial court may also revoke a defendant's right to represent himself if he "deliberately engages in serious and obstructionist misconduct." (*Faretta*, *supra*, 422 U.S. at p. 834, fn. 46; see *People v. Carson* (2005) 35 Cal.4th 1, 8-9 [misconduct not limited to in-courtroom behavior].)

We first point out that, contrary to defendant's assertion, the trial court did not in fact revoke defendant's in propria persona status.**10** Before it accepted defendant's substitution of attorney form, the court noted only that defendant's in propria persona *privileges* had already been revoked at an administrative hearing. Defendant's chief complaint rather is that he mistakenly believed his loss of library privileges would necessarily lead to the revocation of his in propria persona status, a misapprehension the trial court failed to correct. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at pp. 286-287 [defendant allegedly relied on court's misadvisement when relinquishing his *Faretta* right]; cf. *People v. Carter* (1967) 66 Cal.2d 666, 670 [defendant ineffectively waived right to counsel based on mistaken belief reinforced by the court that he would have access to library].) Thus, notwithstanding the fact he signed the substitution form and told the court he understood what this meant, he argues he did not "validly" waive his right to self-representation. At the very least, defendant claims it did not " 'reasonably appear[]' " that he wished to abandon his self-representation, and that the trial court should have had a " 'personal dialogue' " with defendant to determine whether there was a waiver. (*People v. Kenner* (1990) 223 Cal.App.3d 56, 61.) We disagree.

---

**10** Defendant's reliance on *People v. Butler*, *supra*, 47 Cal.4th 814, is therefore misplaced. In *Butler,* a trial court terminated a capital defendant's self-representation after concluding the defendant's trial preparation and his ability to marshal discovery materials in his defense would be limited. A jury subsequently convicted the defendant of murder and sentenced him to death. We reversed the jury's judgment and sentence, concluding that under *Faretta* "inmates still have the right to represent themselves even when their ability to prepare is restricted in custody." (*Id*. at p. 827.) In that regard, defendant's claim that the trial court erroneously relied on the seriousness of the charges to revoke his in propria persona status also fails.

41

Assuming that defendant actually misunderstood the consequences of losing his library privileges, any misunderstanding he had was sufficiently clarified. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at pp. 286-287 [no error where trial court corrected itself after misadvising defendant he could insist counsel present a certain defense if he relinquished right to self-representation].) The prosecution explained to defendant several times that he had "choices," i.e., either he could remain in propria persona because Stein, as advisory counsel, could provide him the necessary materials and research, or he could have Stein represent him. Stein also informed the court that he spoke to defendant for "a good 45 minutes about what it meant" to sign the substitution form and he believed defendant signed it "with an intelligent mind, voluntarily and knowingly."

Although the prosecution and Attorney Stein both made statements suggesting defendant would be better off represented by counsel (see *ante*, at p. 39), these statements simply recognize the obvious challenges defendant would face as a capital defendant proceeding in propria persona. We conclude they do not demonstrate that defendant was compelled to waive his right to self-representation. In isolation, defendant's own assertions that his "only recourse" was to give up his status "involuntarily" may appear troubling; however, our review of the record supports that defendant voluntarily and intelligently relinquished his right. There is "no suggestion that defendant did not understand what he was giving up in confirming that he wished to be represented by counsel, or that he might in fact have wished to represent himself notwithstanding his statements to the contrary . . . ." (*People v. Dunkle*, *supra*, 36 Cal.4th at p. 910.)

Contrary to defendant's contention, the trial court was not required to question defendant further, especially after it had already asked defendant if he voluntarily signed the substitution form and if he understood what that meant. Defendant was familiar not only with the criminal justice system but with his

rights under *Faretta*, having represented himself several times and having even obtained an acquittal. Indeed, the record portrays defendant as articulate, assertive, and intelligent, capable of arguing fine points relating to investigative funds and discovery matters. Rather than unequivocally expressing a desire to represent himself, defendant's main concern appeared to be restoring his library privileges: "I want to represent myself and have access and be allowed to have access to the law library." (See *People v. Stanley*, *supra*, 39 Cal.4th at p. 932 [*Faretta* right waived unless defendants " ' " 'articulately and unmistakably demand to proceed *pro se*' " ' "].) After it became evident that defendant's library privileges would not be restored, the record does not indicate, nor does defendant contend, that he raised the *Faretta* issue at trial again. Based on the circumstance that defendant accepted Stein as counsel and that he did not renew his request for self-representation, "we conclude he must further be found to have ultimately abandoned his desire to invoke his *Faretta* rights in these capital murder proceedings." (*People v. Stanley*, *supra*, 39 Cal.4th at p. 933.)

## B. Guilt Phase

### 1. *Trial court's ruling sustaining Charlie and Elena Trujeque's assertions of the Fifth Amendment privilege*

Defendant claims that the trial court erred by allowing Charlie Trujeque to make a blanket assertion of his Fifth Amendment right against self-incrimination at both the guilt and penalty phases without making any inquiry into the validity of the asserted right, and without considering defendant's constitutional rights to present a defense, to compel the presence of witnesses and to present a case in mitigation of the death penalty. (U.S. Const., 5th, 6th, 8th & 14th Amends.) He adds the trial court also erred in permitting Elena Trujeque to assert her own Fifth Amendment right at the penalty phase because she had waived the privilege by testifying at the guilt phase. In light of our decision to reverse the penalty phase

43

judgment, we will address only Charlie's assertion of the Fifth Amendment privilege at the guilt phase.

### a. Factual background

#### 1) Guilt phase

At trial, in support of its argument that defendant had falsely implicated Charlie and Elena Trujeque in the Facundo murder and was trying to shift the blame to them, the prosecution intended to call both Charlie and Elena as witnesses. Before they testified, the prosecution informed the trial court that the Trujeques might need attorneys because "there may be Fifth Amendment issues." The trial court appointed attorneys, Hattie Harris and Anthony Garcia, for Elena and Charlie, respectively. Harris confirmed that she had spoken to Elena and had advised her client to take the stand.

At the guilt phase, Elena testified about Charlene's relationship with Facundo and her relationship with defendant. Though first denying that she and Charlie had asked defendant to hurt Facundo, she admitted on cross-examination that Charlie had told defendant to break Facundo's arms and legs. Elena conceded she was "on board for that," but did not think defendant would "stick a knife in his chest." She denied promising defendant any money for killing Facundo.

After Elena testified, Charlie's appointed attorney, Anthony Garcia, informed the court that he had advised his client to assert his Fifth Amendment right against self-incrimination. On the stand, Charlie confirmed he was asserting this right. Though it initially allowed the defense to ask Charlie about his concerns for Charlene and her relationship with Facundo, and to ask about the letters defendant wrote to Charlene, the trial court eventually ruled that it would not force Charlie to testify at all in the guilt phase because any questions "taken in context with everything that Mrs. Trujeque has said, can incriminate him."

44

Defense counsel, however, indicated they wished to call Charlie to the stand during the penalty phase as a "family historian" to testify about defendant's family history. The trial court reserved the issue.

### 2) Penalty phase

As expected, defense counsel called Charlie to the stand at the penalty phase and attempted to ask him questions about his siblings, including his deceased brother (defendant's father), Manuel Trujeque. Charlie invoked the Fifth Amendment privilege through his counsel, and refused to answer any questions. The trial court declined defense counsel's request to order Charlie to answer because it reasoned the questions would "lead to what the prosecution's contention is, namely, that because of familial relationships, your client did what he did at the behest of this witness and his wife." The court did, however, allow defense counsel to ask Charlie whether the prosecution had offered him immunity in the Facundo case for asserting his Fifth Amendment rights. Both Charlie and the prosecutor denied there was any such agreement.

After defense counsel proffered the type of questions they would ask Charlie (such as questions about defendant's father's temper, drug use, and history of physical violence toward defendant's mother when she was pregnant with defendant), Charlie reiterated his intent to assert the Fifth Amendment on all these questions. Defense counsel, however, asserted the jury was entitled to hear this information from Charlie about "how Tommy Trujeque got here today. It's violence breeds violence. It's drug addicts breed drug addicts. It all fits in with what the expert witnesses would testify, and he is the family historian from the Trujeque side." Rejecting defendant's claim that information on the Trujeque family could not have any factual nexus to the Facundo murder, the trial court sustained Charlie's assertion of the privilege at the penalty phase as well.

45

As an alternative to Charlie testifying about defendant's family history, defense counsel proposed to call Elena to the stand as a family historian under Evidence Code sections 1310 and 1311. However, her appointed attorney, Hattie Harris, was "hit with the bombshell" that defense counsel had suggested Elena had perjured herself by denying that she ever visited defendant in prison. Based on the possibility that Elena could "incriminate herself for a new and different charge" of perjury, Harris indicated she would advise her client to assert her Fifth Amendment privilege to any questions regarding familial relationships at the penalty phase. On the stand, Elena confirmed she would refuse to answer any questions about her husband's family or defendant's childhood.

On appeal, defendant claims the trial court erred in permitting Charlie to assert his Fifth Amendment privilege at both the guilt and penalty phases, and in allowing Elena to assert her privilege at the penalty phase. He contends that the Trujeques' assertions of the privilege excluded "critical mitigating evidence" about defendant's father and his father's family history. In deciding whether the trial court erred in sustaining the privileges of these witnesses, we apply an independent standard of review. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 (*Seijas*).) For reasons that follow, we find no error with respect to Charlie's assertion of the Fifth Amendment privilege at the guilt phase. As noted, given our reversal of the penalty judgment, we do not address defendant's challenges to Charlie's and Elena's assertions of the privilege at the penalty phase.

### b. *Legal principles*

"It is a bedrock principle of American (and California) law, embedded in various state and federal constitutional and statutory provisions, that witnesses may not be compelled to incriminate themselves. In an oft-cited case, the high court stated that this privilege 'must be accorded liberal construction in favor of

46

the right it was intended to secure.' " (*Seijas*, *supra*, 36 Cal.4th at p. 304, quoting *Hoffman v. United States* (1951) 341 U.S. 479, 486 (*Hoffman*).) The test from *Hoffman* provides that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (*Id.* at pp. 486-487.) In that regard, a witness's answers need not in themselves support a conviction under a criminal statute, but may "furnish a link in the chain of evidence" needed to prosecute the witness for a crime. (*Id.* at p. 486.) Ultimately, a trial court may reject an assertion of the privilege only when it appears to the court " '*perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." (*Id.* at p. 488; *Seijas*, *supra*, 36 Cal.4th at p. 305 [Evid. Code, § 404[11] incorporates the *Hoffman* test construed "broadly in favor of the privilege"].)

A witness, however, may not make a blanket assertion of the privilege against self-incrimination. (See *U.S. v. Goodwin* (5th Cir. 1980) 625 F.2d 693, 701.) A witness's "say-so does not itself establish the hazard of incrimination. It is for the court to say whether his silence is justified . . . ." (*Hoffman*, *supra*, 341 U.S. at p. 486.) In other words, a trial court "must make 'a particularized inquiry, deciding, in connection with each specific area that the questioning party wishes to

[11]     The provision states: "Whenever the proffered evidence is claimed to be privileged under Section 940 [the privilege against self-incrimination], the person claiming the privilege has the burden of showing that the proffered evidence might tend to incriminate him; and the proffered evidence is inadmissible unless it *clearly appears* to the court that the proffered evidence *cannot possibly have a tendency* to incriminate the person claiming the privilege." (Evid. Code, § 404, italics added.)

explore, whether or not the privilege is well-founded.' [Citation.] Although the witness may have a valid claim to the privilege with respect to some questions, the scope of that privilege may not extend to all relevant questions. The witness may be totally excused only if the court finds that he could 'legitimately refuse to answer essentially all relevant questions.' [Citation.]" (*U.S. v. Goodwin*, *supra*, 625 F.2d at p. 701.) This has long been the rule in California in both criminal and civil proceedings. (*Wadford v. Medeiros* (1984) 160 Cal.App.3d 1035, 1045.)

### c. Application

With respect to Charlie's privilege, basic questions about his family background and his relationship to defendant, though seemingly innocuous, could have exposed Charlie to prosecution for solicitation of murder or as an accessory to murder. Defendant testified that Charlie had paid him to kill Facundo, and Charlie's wife, Elena, confirmed that Charlie had asked defendant to break Facundo's arms and legs. As the prosecution explained, the defense theory was that Charlie "knew by saying to [defendant], go take care of it, take care of the problem, that as a family member, he would do that. He would do the killing, he would take care of the problem for the family. . . . The mere fact that this witness is related to [defendant] in any way is incriminating to this witness in the context of those facts." The trial court added that defendant's proposed question, for instance, about when Charlie's parents died "by itself perhaps can't incriminate him, but following that question there will be other questions" that will ultimately lead to the conclusion that defendant killed Facundo at Charlie's request. The existence of this family relationship, in other words, provided a "link in the chain of evidence" supporting defendant's motive in the Facundo murder. (*Hoffman*, *supra*, 341 U.S. at p. 486.) Under these circumstances, it does not clearly appear

that the proffered testimony could not possibly have a tendency to incriminate Charlie. (See Evid. Code, § 404; *Seijas*, *supra*, 36 Cal.4th at p. 307.)

Nevertheless, defendant contends that there were other subjects that Charlie could have safely testified to, but that the trial court "made no inquiry at all" as to the proper scope of the questioning. The record belies this assertion. At the guilt phase, the trial court explored other possible areas for questioning, specifically asking defense counsel, "Other than your desire to question this witness about whether or not he read the contents of the letter, *what other areas do you want to go into with this witness*?" The court initially allowed counsel to ask Charlie about Charlene's relationship with Facundo. The court, however, later determined that *any* questions, in light of Elena's testimony that Charlie had enlisted defendant to hurt Facundo, could incriminate Charlie. In sum, the record supports that the trial court made a particularized inquiry about Charlie's assertion of the privilege before determining Charlie "could 'legitimately refuse to answer essentially all relevant questions' " at the guilt phase. (*U.S. v. Goodwin*, *supra*, 625 F.2d at p. 701.)

Based on the foregoing, we conclude the trial court did not err in sustaining Charlie's assertion of the Fifth Amendment privilege. Even assuming that the trial court erred, we conclude any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Defendant asserts that any error was not harmless because Charlie's assertion of the privilege prevented the jury from hearing evidence that would have reduced the charge or acquitted defendant of first degree murder. Specifically, defendant claims that had Charlie testified, defense counsel could have questioned him on how the murder of

49

Charlene's cousin, Vicki, by an abusive boyfriend[12] intensified the concerns Charlie and defendant had for Charlene, which in turn would have supported defendant's claim of imperfect defense of others. Defendant also sought to elicit testimony that Charlie did not believe defendant's letters to Charlene were inappropriate, thus undercutting the prosecution's theory that defendant killed Facundo because defendant had feelings for Charlene.

Much of the evidence defendant sought to elicit from Charlie was already before the jury. Elena testified not only that she and Charlie were concerned about Charlene's abusive relationship with Facundo, but that Charlie had specifically asked defendant to hurt Facundo. The trial court, in excluding evidence of Vicki's murder under Evidence Code section 352, told defense counsel "you've described Mr. Facundo as the despicable, cowardly wife beater that he was, and I think that's enough." Charlie's testimony would have simply added to the evidence the jury already heard. (*People v. Brown* (2003) 31 Cal.4th 518, 576 [Evid. Code, § 352 "permits the exclusion of evidence on the ground that it is cumulative"].) As such, any error in excluding the testimony of Charlie was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

> 2. *Trial court's refusal to instruct on imperfect defense of another or necessity relating to the Facundo murder*

Defendant's main argument with respect to the Facundo murder was that he acted to protect his cousin, Charlene, from Facundo's further abuse and possibly from death. Based on this argument, defense counsel requested that the trial court instruct the jury with a series of instructions relating to the imperfect defense of another. (CALJIC Nos. 5.13, 5.14, 5.15, 5.16, 5.17.) Alternatively, the defense

---

**12** The evidentiary issue regarding Vicki's murder is discussed separately below. (See *post*, at pp. 56-57.)

also sought jury instructions on mistake of fact and necessity. (CALJIC Nos. 4.35, 4.43.) When the trial court stated that "based on the evidence that I heard" there was no threat of imminent harm, defense counsel repeatedly argued that it was up to the *jury* to decide whether there was imminent harm or not. However, the trial court refused to give any of the requested instructions because it found that based on "the totality of the evidence that has been presented" there was no threat of imminent danger, and that "[i]f that fear was present, it certainly did not extend to the degree of committing a homicide." Further, the court also pointed out that these instructions were, in fact, "negate[d]" by the evidence, including defendant's statement to Los Angeles County Sheriff's Deputy Frank Durazo.

On appeal, defendant argues that the trial court's failure to give these instructions denied him his right to present a defense, his right to a jury trial, and his right to a reliable penalty determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and analogous provisions of the state Constitution. He reiterates that it was up to the jury, not the court, to determine the credibility and validity of the imperfect defense of others. In particular, he maintains that it was the jury's province to determine whether he had an *unreasonable* belief that Charlene was in peril. With respect to his request for an instruction on the necessity defense, defendant similarly posits that the factual dispute regarding the immediacy of the danger Facundo posed, i.e., whether Charlene was injured weeks before the murder or shortly before, should have been resolved by a properly instructed jury and not the court. For reasons that follow, we conclude this claim lacks merit.

### a. *Imperfect defense of others*

"[O]ne who kills in imperfect defense of others — in the actual but unreasonable belief he must defend another from imminent danger of death or

51

great bodily injury — is guilty only of manslaughter." (*People v. Randle* (2005) 35 Cal.4th 987, 997 (*Randle*) [recognizing imperfect defense of others].) To satisfy the imminence requirement, "[f]ear of future harm — no matter how great the fear and no matter how great the likelihood of the harm — will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury. ' "[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' . . . Put simply, the trier of fact must find an *actual* fear of an *imminent* harm." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.) Because the reasonableness (or unreasonableness) of this claim is tested from the defendant's perspective, however, a trier of fact may consider a victim's prior threats and violence to corroborate the defendant's testimony that he feared for his or another's life. (*Randle*, *supra*, 35 Cal.4th at pp. 999-1000; see *People v. Davis* (1965) 63 Cal.2d 648, 656 ["The immediate issue was not the truth of the matters reported to him but whether he had cause to believe them and, if so, whether it was reasonable for him to predicate a fear thereon."].)

Imperfect defense of others, like imperfect self-defense, is not a true defense, but a shorthand description for a form of voluntary manslaughter. (See *People v. Elmore* (2014) 59 Cal.4th 121, 134; *Randle*, *supra*, 35 Cal.4th at p. 997 [defendant lacked malice required for murder].) It follows that voluntary manslaughter arising from the imperfect defense of another is a lesser included offense of the crime of murder. (See *Randle*, *supra*, 35 Cal.4th at p. 1003; see also *People v. Barton* (1995) 12 Cal.4th 186, 200-201.) If supported by substantial evidence, a trial court has the duty to instruct on a lesser included offense. (*People v. Duff* (2014) 58 Cal.4th 527, 561.) "The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. [Citations.] That voluntary

manslaughter is a lesser included offense of murder is undisputed." (*Ibid.*)
Ultimately, "[i]t is for the *court* alone to decide whether the evidence supports
instruction on a lesser included offense." (*People v. Prince* (2007) 40 Cal.4th
1179, 1264.)

On appeal, we independently review whether a trial court erroneously failed
to instruct on a lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680,
705.) We conclude that the trial court did not err in refusing this instruction
because there was no evidence that defendant actually, but unreasonably, believed
Facundo presented an imminent threat of physical harm to Charlene when
defendant killed him. (See *Randle*, *supra*, 35 Cal.4th at p. 997.)

By defendant's own account (established through both his trial testimony
and the recorded statement), he was paid by Charlie and Elena to "take care of the
problem" and kill Facundo, leading to the inescapable conclusion that he had
planned all along to kill him *regardless* of any imminent danger or threat Facundo
posed. This conclusion is bolstered by evidence that on the day of the murder,
defendant appeared angry because of Charlene's black eye and repeatedly asked
Charlene whether Facundo would be coming by later because defendant wanted to
"meet him and talk to him." When Facundo came to Charlie and Elena's house to
pick up Charlene, defendant asked if they would drop off him and their cousin,
Raymond Guzman, at the house of Raymond's sister, Pat Perez, which they did.
Rather than showing any apprehension, much less fear, of Facundo, defendant's
actions demonstrated he wanted to be physically near Facundo and have access to
him. Moreover, shortly before defendant struggled with Facundo and fatally

stabbed him, there was no evidence suggesting that the victim had acted in any threatening manner.[13]

Even without considering whether defendant was paid to kill Facundo, the evidence strongly supports that defendant killed him mainly because of Facundo's past physical abuse of Charlene. Defendant testified that Facundo "deserved it. He had it coming . . . [¶] For beating up my cousin." He also admitted he "couldn't wait to kill him. I didn't want to wait," and that he "*could have done it later if I wanted to.*" Defendant's plan was "to stab him in the heart." "The only plan I had was to kill him. It didn't matter where." Facundo's past abuse of Charlene and his threats to her were unaccompanied by any intention or ability to carry them out at the time he was killed; thus, they are insufficient to show an *imminent* threat justifying an instruction on manslaughter as a lesser included offense. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1094-1095.)

Indeed, the record is replete with defendant's admissions revealing his brazen and single-minded determination to kill Facundo for physically abusing Charlene. In defendant's own words, "[t]he only plan I had was to kill him" and he "could have done it later if I wanted to." In short, there was no evidence that defendant *actually* believed — whether reasonably or unreasonably — that he faced an *imminent* peril that he had to " ' "instantly deal[] with" ' " when he killed Facundo. (*In re Christian S.*, *supra*, 7 Cal.4th at p. 783; see *People v. Michaels* (2002) 28 Cal.4th 486, 530-531.) Thus, his claim based on imperfect defense of another necessarily fails.

---

**13** Though Facundo apparently smoked PCP both before picking up Charlene and on the drive to Pat's house, there is no indication that he either became violent, as defendant suggests, or was incapacitated, as the People assert, due to his smoking PCP that day.

54

Even if defendant exaggerated his own culpability in order to receive the death penalty, there is no other evidence suggesting that the imperfect defense of another was otherwise plausible. There is nothing to suggest his so-called "misguided effort" to protect Charlene from Facundo was based on anything other than his desire to punish Facundo for his past abuse. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 174 ["Speculation is insufficient to require the giving of an instruction on a lesser included offense."].)

b. *Necessity*

Defendant's related claim that the trial court erred in refusing to instruct on the defense of necessity (CALJIC No. 4.43) is equally meritless. "The defense of necessity generally recognizes that ' "the harm or evil sought to be avoided by [the defendant's] conduct is greater than that sought to be prevented by the law defining the offense charged." ' [Citation.] The defendant, who must have possessed a reasonable belief that his or her action was justified, bears the burden of proffering evidence of the existence of an emergency situation involving the imminence of greater harm that the illegal act seeks to prevent. [Citations.]" (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 100.) "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035 [deciding factual predicate of defendant's necessity defense "insufficient as a matter of law"]; *People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1164 [necessity defense is " 'very limited' " and " 'represents a policy decision not to punish an

individual despite proof of the crime' "].) There was no evidence that defendant sought to prevent any imminent harm or that he faced any emergency situation when he killed Facundo.[14]

### 3. Trial court's refusal to admit evidence that defendant's cousin had been killed by an abusive boyfriend

During the cross-examination of Elena at the guilt phase, defense counsel tried to elicit testimony about the murder of Charlie's niece (and Charlene and defendant's cousin), Vicki, who was reportedly stabbed and killed by an abusive boyfriend. Counsel asserted that because of Vicki's murder, Elena and Charlie were afraid that Facundo would kill Charlene and talked to defendant about their fears, which in turn affected defendant's state of mind about the threat he perceived Facundo posed to Charlene. The trial court, however, responded that Elena had already admitted that she felt Charlene's life was in danger because of Facundo. Further, the prosecution maintained that because Elena was not present when Vicki was killed, she lacked personal knowledge about how or why Vicki was killed.

Though the trial court sustained the prosecution's objections based on lack of foundation and hearsay, defense counsel repeatedly tried to question Elena about Vicki's murder, prompting the court to say: "I think you're plowing the same ground until it's now very fine sand. . . . [¶] . . . [Y]ou've described Mr. Facundo as the despicable, cowardly wife beater that he was, and I think that's enough." While recognizing defendant's argument about the relevance of Elena's state of mind, the trial court ultimately prohibited further questions about Vicki's

---

**14** Defendant makes similar claims regarding the imperfect defense of others and the necessity defense with respect to the Apodaca murder, which we do not discuss given our reversal of the judgment of conviction.

murder under Evidence Code section 352. On appeal, defendant claims that the trial court's exclusion of this evidence violated his constitutional right to present a defense, i.e., the imperfect defense of another. (See U.S. Const., 5th, 6th, 8th, 14th Amends.)

We conclude the trial court did not abuse its discretion in limiting the questioning about Vicki's murder. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1070 [exclusion of evidence under Evid. Code § 352 subject to abuse of discretion standard].) As noted above, Elena testified that she did not know how or why Vicki was killed. Further, she stated defendant never brought up Vicki at any time, including when he admitted to Elena that he had stabbed Facundo with a knife. In other words, as the Attorney General argues, Elena "was not the appropriate witness to discuss Vicki's death, and the details of Vicki's death were irrelevant and prejudicial because there was no evidence at all that they factored into Facundo's murder." We conclude that the trial court properly excluded evidence of Vicki's murder under Evidence Code section 352. (See *People v. Minifie*, *supra*, 13 Cal.4th at p. 1071.)

Contrary to defendant's suggestion, by prohibiting questions to Elena about Vicki's killing, the trial court did not thereby prevent defendant from presenting a defense that he had a heightened anxiety that Facundo would kill Charlene. In fact, the jury heard from defendant himself that Vicki's boyfriend had stabbed and killed her. Though defendant admitted Facundo "deserved to die because he was beating up" Charlene, defendant did not know whether Charlene and Facundo had the same kind of relationship as Vicki and her boyfriend. Thus, by his own admission, defendant made no connection between Facundo's murder and Vicki's killing.

### 4. *Trial court's admission of expert testimony from a pathologist who did not perform autopsies of victims*

Relying on *Crawford v. Washington* (2004) 541 U.S. 36, and its progeny, defendant claims that the forensic pathologist's testimony on the two autopsies performed by nontestifying pathologists violated his confrontation rights under the Sixth Amendment. Specifically, defendant maintains that the conclusions in the autopsy reports were testimonial hearsay, and that the prosecution made no showing that the two pathologists who conducted the autopsies were unavailable to testify. He adds that the pathologist's surrogate testimony precluded him from meaningfully testing the nontestifying pathologist's "honesty, proficiency, and methodology." (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 321.) We conclude that we need not decide this claim on the merits because any error was harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

At trial, Dr. Eugene Carpenter, Jr., a forensic pathologist who had worked for the Los Angeles County coroner's office for 11 years and had performed over 4,000 autopsies, testified about the autopsies of both Max Facundo and Raul Apodaca. Dr. Carpenter did not perform or attend either autopsy. Rather, Dr. Eva Heuser performed the autopsy on Facundo on June 23, 1986, and Dr. Sara Reddy performed the autopsy on Apodaca on January 25, 1987. Dr. Reddy also testified and was cross-examined at the preliminary hearings of both defendant and his codefendant at the time, Jesse Salazar, in 1987. Dr. Heuser and Dr. Reddy had both retired from the Los Angeles County coroner's office at the time of defendant's trial in 1999.

Before testifying, Dr. Carpenter reviewed the autopsy reports on Facundo and Apodaca, the reports' attachments, and related photographs. (The record does not reflect that either autopsy report was admitted into evidence.) Dr. Carpenter testified that Facundo suffered at least eight stab wounds, mostly to the chest area

58

and the lungs. He explained that Facundo's pulmonary artery, aorta, and liver were all injured and that "[e]ach of these injuries is a lethal wound. Each one is capable of causing death to a body within a minute or so." After reviewing the autopsy report, photographs, and items contained in the report, Dr. Carpenter testified he was "in agreement" with Dr. Heuser's conclusion that Facundo's cause of death was stab wounds.

As an initial matter, we note that defendant has *not* forfeited this issue by failing to object at trial to Dr. Carpenter's testimony, and the Attorney General does not argue otherwise. (See *People v. Harris* (2013) 57 Cal.4th 804, 839-840.) In *Crawford*, the high court held that a criminal defendant has the Sixth Amendment right to confront and cross-examine any witness who offers a testimonial out-of-court statement against the defendant. (*Crawford*, *supra*, 541 U.S. at pp. 50-56.) Thereafter, with certain exceptions, the high court extended *Crawford*'s holding to forensic reports available for use at trial (*Melendez-Diaz v. Massachusetts*, *supra*, 557 U.S. 305), and laboratory reports (*Bullcoming v. New Mexico* (2011) 564 U.S. __ [131 S.Ct. 2705]). (See *People v. Dungo* (2012) 55 Cal.4th 608, 617-619 (*Dungo*) [identifying two critical components — formality and primary purpose — of testimonial out-of-court statements].)

In *Dungo*, we explained that statements in an autopsy report describing a nontestifying pathologist's observations about the condition of the victim's body are *not* testimonial because the "primary purpose" of recording such facts does not relate to a criminal investigation. (*Dungo*, *supra*, 55 Cal.4th at p. 621, italics omitted.) We also described these statements, which "merely record objective facts," as being "less formal than statements setting forth a pathologist's expert conclusions" about the victim's cause of death. (*Id*. at p. 619.) In *Dungo*, it was unclear whether the pathologist's description of the victim's body was based solely on the autopsy photographs, solely on the nontestifying pathologist's

59

autopsy report, or on a combination of both. (*Id.* at pp. 615.) Nonetheless, because the pathologist did not describe the *conclusions* of the nontestifying pathologist, we had no occasion to decide "whether such testimony, if it had been given, would have violated the defendant's right to confront" the nontestifying pathologist. (*Id.* at p. 619; but see *People v. Edwards* (2013) 57 Cal.4th 658, 704-708.)

In the present case, Dr. Carpenter gave his own opinions about the causes of death of Facundo and Apodaca. He testified he "made up my own mind" after reviewing both the autopsy reports and photographs. Dr. Carpenter underscored that he "never said that I told the jury what [Drs. Heuser and Reddy] saw and what they thought. I just read their autopsy report, not their minds." At the same time, he also described to the jury these nontestifying pathologists' conclusions regarding Facundo's cause of death, including expressing whether he agreed with these conclusions. (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 707.) Dr. Carpenter explained that he was "in agreement" with "the conclusion by Dr. Heuser that the cause of death [of Facundo] was as a result of stab wounds."

Even assuming error, we conclude it was harmless beyond a reasonable doubt under *Chapman, supra*, 386 U.S. at page 24. (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 707 [even if testifying pathologist's statements about another pathologist's conclusion violated confrontation clause, there was no prejudice]; see also *People v. Capistrano* (2014) 59 Cal.4th 830, 874.) Regarding victim Facundo, because Dr. Carpenter independently agreed with Dr. Heuser's opinions and because neither the cause of death, i.e., stab wounds, nor the source of the wounds, i.e., a knife, was in dispute at trial, "no prejudice was possible under any standard." (*People v. Edwards*, *supra*, 57 Cal.4th at p. 707.)

Because we are reversing defendant's conviction for the second degree murder of Apodaca (see, *ante*, at p. 34), we do not discuss whether Dr. Carpenter's

60

testimony regarding Dr. Reddy's findings on Apodaca's death was harmless error with respect to this murder conviction. However, with respect to Facundo's murder and the Spartan Burgers robbery, convictions we are affirming, we conclude that any error from the admission of Dr. Carpenter's testimony was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. p. 24.) Dr. Reddy's findings, to which Dr. Carpenter testified, concerned only Apodaca's autopsy. For that reason, the jury's guilty verdicts on the Facundo murder and robbery counts were " ' "surely unattributable to the error." ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

> 5. *Trial court's admission of defendant's redacted letter to the Los Angeles County District Attorney*

Over defendant's objections at both the guilt and penalty phases, the trial court granted the prosecution's request to admit a letter defendant wrote to then Los Angeles County District Attorney Gil Garcetti in September 1998. In the letter, defendant admitted he murdered both Apodaca and Facundo while "fully aware of all of my mental faculties" and urged Garcetti to seek the death penalty against him.

In moving to exclude this letter under Evidence Code section 352, defense counsel claimed the letter had little to no probative value and was prejudicial and cumulative to other admitted evidence. The trial court, however, agreed with the prosecution's assertion that the letter "scream[ed] premeditation and deliberation" and spoke "volumes to his mental state." It also found defendant's letter to be "probably one of the most literal and coherent letters and eloquent letter, in its own way, that I've read in a long time." In the end, although the trial court concluded the letter was admissible, it granted defense counsel's request to redact certain portions for the jury. At the guilt phase, the trial court redacted those portions that discussed defendant's lack of remorse for the murders, two other

61

murders defendant allegedly committed in prison and got away with, his intent to kill in prison if he did not get the death penalty, and defendant's self-representation. Over defendant's renewed objection at the penalty phase, the court also admitted the letter into evidence, but redacted only that portion discussing defendant's two other murders that he "didn't get caught for."

Despite the redactions, defense counsel argued the letter still contained objectionable statements, most notably the following: "If I had the opportunity to do it over I would cut off their heads and send 'em both to their family!"; "both of those cowards deserved what they got: death and an early expiration in life, to say the least!"; "the two (2) cowards that I am proud of taking out"; characterizing the murders as "all a big game, and the only reason I lost part of the game, is because I got <u>caught</u>, that's all"; referring to his gang moniker "El Killer De Varrio White Fence." Ultimately, the trial court agreed with the prosecution's argument that statements that the victims got what they deserved and that defendant would do it again, were relevant to undercut defendant's claim that the killings were based on provocation or imperfect defense of others. The court later agreed with the prosecution that the "cut off their heads" statement was relevant to prove premeditation and to rebut any argument that either murder was voluntary manslaughter.

On appeal, defendant renews his claim that this "highly inflammatory" letter to Garcetti should have been excluded altogether under Evidence Code section 352 and that the trial court abused its discretion in failing to so. In arguing that the letter was "riddled with hyperbole, untruths, and deliberately provocative and offensive statements designed to appeal to jurors' fears and emotions," defendant claims that his expressed desire to receive the death penalty made the letter unreliable and thus diminished its probative value. (See *People v. Coleman* (1985) 38 Cal.3d 69, 85 [*victim*'s letter deemed unreliable because she had "a

62

motive to misrepresent or exaggerate the conduct of the accused"]; see also *People v. Maury* (2003) 30 Cal.4th 342, 433 [polygraph evidence's doubtful reliability outweighed any probative value].)  He asserts that the admission of this letter violated his constitutional rights to a fair trial and to a fair and reliable sentencing. (U.S. Const., 5th, 6th, 8th & 14th Amends.)

A trial court's ruling under Evidence Code section 352 is reviewed under the deferential abuse of discretion standard.  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)  "[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so," if the record shows the court was aware of its duty and undertook such Evidence Code section 352 balancing. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169.)  We conclude that even if the court abused its discretion in admitting the letter, any error was harmless.  With regard to the Facundo murder and Spartan Burgers robbery, both convictions that we shall affirm, there was overwhelming evidence — apart from this letter — that defendant committed these crimes.  (See *ante*, pp. 2-6, 9.)

> 6.  *Prosecution's impeachment of defendant with the Rothenberg murder conviction*

As discussed earlier, we conclude that defendant's 1971 conviction for the Rothenberg murder was obtained in violation of the double jeopardy clause, requiring us to set aside the prior murder special-circumstance finding.  (See *ante*, at p. 26.)  In a separate claim, defendant asserts that because this constitutionally invalid conviction was also used to impeach defendant's trial testimony, his murder convictions should be reversed as well.  Defendant talks globally about reversals of his "convictions," which include robbery, but he focuses mainly on the impeachment's impact on his convictions for murder.

After the trial court confirmed with defendant that he wished to testify in his defense against the advice of counsel, defense counsel moved to "sanitize the

30-year-old murder conviction" of Rothenberg right after defendant took the stand. Defense counsel argued that the 1971 murder was extremely remote in time (and committed when defendant was just 16 years old), not probative of a witness's credibility, and highly prejudicial because defendant was on trial for two other murders. Based on these reasons, counsel urged the court to preclude this impeachment evidence under Evidence Code section 352. Defense counsel also added that there were other "numerous crimes where they can show [defendant's] readiness to do evil without having to say he has a prior murder conviction." In denying defendant's request to exclude the prior conviction, the trial court explained, among other things, that murder is a crime of moral turpitude, and that the prior murder was not remote in time because of defendant's "pattern of continued criminal conduct." On cross-examination, the prosecution impeached defendant with the 1971 second degree murder conviction, along with a number of other felony convictions.

On appeal, defendant claims the prosecution improperly used this constitutionally invalid murder conviction to impeach his credibility, and that, in any event, the conviction should have been excluded under Evidence Code section 352. As with defendant's claim regarding the prior murder special circumstance, the Attorney General asserts that defendant has forfeited the double jeopardy issue by failing to object to the prior conviction specifically on that ground. As before, we reach the merits of this claim.

Turning to the merits, we agree with defendant that there was error: "We are convinced that the use of a constitutionally invalid prior conviction to impeach testimonial credibility is improper, and that to allow such impeachment is error under California law. . . . We think it equally clear that the utilization of such a conviction, at the trial of a subsequent offense, for any purpose leading to a conviction for such subsequent offense, is violative of the due process clause of

the Fourteenth Amendment." (*People v. Coffey* (1967) 67 Cal.2d 204, 218-219.)

To determine whether we should reverse the remaining murder conviction, the issue is what, if any, prejudice defendant suffered as a result of the error. Because this error is of "federal constitutional dimension" (*People v. Coffey*, *supra*, 67 Cal.2d at p. 218), the beyond a reasonable doubt standard of prejudice under *Chapman*, *supra*, 386 U.S. 18, applies. (*People v. Coffey*, *supra*, 67 Cal.2d at pp. 218-219 [error is not "per se prejudicial"].) In this context, the *Chapman* "rule requires reversal if, upon an examination of the entire record, it appears reasonably possible that the error might have materially influenced the jury in arriving at its verdict, and the error must be considered harmless if the likelihood of material influence is not within the realm of reasonable possibility. In the circumstances of the instant case, the application of the indicated standard requires that we direct our attention to defendant's courtroom testimony." (*People v. Coffey*, *supra*, 67 Cal.2d at pp. 219-220.) For reasons that follow, we conclude the error was harmless.

As noted above, in addition to the invalid Rothenberg murder conviction, the prosecution impeached defendant with other felony convictions, which defendant testified consisted of "robberies, murder, burglary and assault with a deadly weapon." Specifically, he admitted on the stand — without reference to any specific underlying facts of the crimes — to the following: a 1977 conviction for two counts of assault with a deadly weapon; a 1979 conviction for attempted murder; a 1989 conviction for four counts of robbery; and a 1998 conviction for robbery. With respect to the Facundo murder charge he was facing, defendant testified (sometimes emphatically) that he killed the victim. Given defendant's courtroom admissions and his extensive criminal history, we conclude it does not appear "reasonably possible" that the jury's consideration of the additional second

65

degree murder conviction "materially affected" its decision to convict defendant of the first degree murder of Facundo. (*People v. Coffey*, *supra*, 67 Cal.2d at p. 220.)

Although defendant argues that the prosecution improperly used the Rothenberg murder conviction to establish his *propensity* to commit murder, the trial court instructed the jury to consider defendant's prior convictions "only for the purpose of determining the believability of that witness." (CALJIC 2.23.) We presume the jury understood and followed this instruction. (See *People v. Homick* (2012) 55 Cal.4th 816, 873.) Likewise, defendant's Evidence Code section 352 claim, which is reviewed under the reasonable probability standard for prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836), affords him no relief. Because we conclude there was no prejudice under the stricter *Chapman* standard, there can be no prejudice under the *Watson* standard.

### 7. *Correction to the abstract of judgment*

Defendant contends that the abstract of judgment erroneously lists his sentence for the Apodaca murder as 25 years to life under the three strikes sentencing law. This contention (though accurate) is moot because we are reversing the judgment of conviction. Nonetheless, the abstract of judgment also indicates that defendant has no credit for time served, which contradicts the minute order from that sentencing hearing stating defendant was given total credit for 576 days in custody. On remand, the trial court should make any necessary corrections regarding defendant's custody credits.

### III. CONCLUSION

For the foregoing reasons, we reverse the judgment of conviction for the second degree murder of Apodaca, set aside the prior murder and multiple murder special-circumstance findings, reverse the judgment of death, and remand to the trial court for resentencing in accordance with this opinion. On remand, the trial court should consider whether to impose any sentence enhancements that were originally stayed pending imposition of the death judgment.

In all other respects, the judgment is affirmed.

**CHIN, J**.


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

67

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Trujeque

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S083594
**Date Filed:** May 28, 2015

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Patrick Couwenberg


_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Christina A. Spaulding, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster, Joseph P. Lee and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christina A. Spaulding
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607
(510) 267-3300

Eric J. Kohm
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2273

2