Filed 2/21/24  In re G.M. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re G.M., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B319977 (Super. Ct. No. YJ40725) (Los Angeles County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>G.M.,<br><br>    Defendant and Appellant. | |

G.M. appeals from the jurisdictional and dispositional orders entered after the juvenile court found that he committed voluntary manslaughter (Pen. Code,[1] § 192, subd. (a)), sustained a Welfare and Institutions Code section 602 petition, and ordered suitable placement in a secure facility.  G.M. contends there was insufficient

---

[1] Unlabeled statutory references are to the Penal Code.

evidence to support the court's finding that he committed manslaughter.  We affirm.

FACTUAL AND PROCEDURAL HISTORY

In 2021, G.M. was a 16-year-old resident of the short-term residential treatment program (STRTP) at Wayfinder, a group home for minors.  During the afternoon of January 2, a fight broke out between I.C. and another STRTP resident.  I.C. suffered a black eye during the fight.  He grew angry and vandalized Wayfinder property for the next several hours.  Wayfinder staff did not intervene.

Around 8:00 p.m., night shift supervisor Eryn Watkins locked I.C. out of his room.  When the other STRTP residents learned of this, they began to throw food and damage Wayfinder property.  Watkins tried to deescalate the situation and called police to tell them what was going on.  Police refused to respond absent a physical altercation.

I.C. threatened several Wayfinder staff members, including David Hillman, David Le'Gall, and William Wiley-Yancy.  Other STRTP residents, including G.M., encouraged I.C. to challenge staff members to fight.  After I.C. challenged Wiley-Yancy, Wiley-Yancy took I.C. outside for a walk so he could calm down.

G.M. and several other STRTP residents and staff members followed I.C. and Wiley-Yancy outside.  After I.C. repeatedly challenged Wiley-Yancy, Watkins stepped in and tried to calm the situation.  Other Wayfinder staff members did the same.

I.C. punched Wiley-Yancy on the shoulder, and Le'Gall tackled him to the ground.  Other residents then began to attack staff members, including one STRTP resident who headbutted Hillman.  After the attacks subsided, Hillman said he could not breathe and staggered around the courtyard.  Residents, including

2

G.M., then restarted their attacks on Hillman. Some punched him, while others pulled his hair. One resident stomped on Hillman's head multiple times. Others repeatedly punched him in the face. Still others kicked him in the head and body.

Hillman eventually got up, but was stumbling and had difficulty walking. STRTP residents, including G.M., then attacked Hillman a third time. G.M. punched Hillman several times, hitting his lower body.

Sheriff's deputies arrived and arrested the STRTP residents involved in the assaults. Watkins called an ambulance for Hillman. He subsequently died from blunt force trauma to the head.

Prosecutors filed a petition alleging that G.M. murdered Hillman. (§ 187, subd. (a).) At the jurisdictional hearing, Dr. Francesca Lehman, an expert on adolescent brain development, testified that G.M. was at the stage of development associated with the most high-risk behavior. G.M. had also experienced significant trauma that could hinder his ability to regulate his emotions: He witnessed his mother endure physical and sexual abuse, and on occasion intervened to try to protect her. She had substance abuse and mental health issues, and provided G.M. with alcohol and methamphetamines. G.M.'s father died of cancer just four months before the attack on Hillman. His mother's parental rights were terminated one month later, which resulted in his placement at Wayfinder.

Additionally, G.M. suffered from posttraumatic stress disorder (PTSD), which can damage the emotional response system. A hallmark feature of PTSD is hypervigilance, which can trigger a fight-or-flight response or a violent reaction. Dr. Lehman opined that the presence of larger peers who were seemingly unchecked by Wayfinder staff members could trigger G.M.'s PTSD.

3

G.M. had also been diagnosed with severe depressive disorder, which limited his ability to make reasoned decisions and increased his emotionally driven decisions. He was hospitalized twice for depression and mental health issues, and had been placed on psychiatric holds during the months prior to the attack on Hillman. He twice attempted suicide, and lost more than 70 pounds.

Dr. Lehman explained that social and peer influences are hallmarks of adolescence. G.M. naturally would want to fit in with his peers. Placing lower-risk youths like G.M. with higher-risk youths is not advised because the lower-risk youths would be susceptible to influence. Given G.M.'s history of trauma and PTSD, his exposure to an emotionally aroused state would negatively affect his decision-making and ability to appreciate risks.

After the conclusion of testimony, the juvenile court considered jury instructions on voluntary manslaughter. (See CALCRIM Nos. 570 [heat of passion] and 571 [imperfect self-defense or imperfect defense of another].) As to heat of passion, the court noted there was "some evidence" that Wiley-Yancy provoked G.M. and the other STRTP residents by daring I.C. to hit him and then laughing when he did. And as to imperfect defense of another, the court noted that "if it was [G.M.'s] plan to go to the aide [*sic*] of [I.C.], it was an unreasonable one under the circumstances."

The prosecutor argued G.M. acted with implied malice when he punched Hillman because Hillman was defenseless and had already been punched and kicked repeatedly by STRTP residents. She argued G.M. was at least culpable of murder as an aider and abettor. She also argued that the juvenile court should not reduce G.M.'s culpability to voluntary manslaughter because the evidence

4

did not show he was adequately provoked or acted in imperfect self-defense or defense of others.

Defense counsel argued voluntary manslaughter—under the theories of both heat of passion and imperfect defense of others—required a finding of implied malice that is later negated. He explained that to find that G.M. committed voluntary manslaughter the court first had to "determine [that] he had the intent to kill; implied. It's not an attempt to injure, it's not an intent to cause a lot of damage. [¶] [The prosecutor] must prove beyond a reasonable doubt that [G.M.] had the implied intent to kill David Hillman" or that "[h]e deliberately acted with conscious disregard[.]" And to find G.M. guilty of manslaughter as an aider and abettor the prosecutor had to show that he "had the implied malice second degree murder intent, with knowledge of what the perpetrator was going to do." Counsel argued G.M. did not act with any of these mental states because, according to Dr. Lehman, "whatever took place in that dark grassy area triggered something [that] then started this cascade of emotions."

The juvenile court found that G.M. was not a direct perpetrator of Hillman's murder. Therefore, "the real issue [was] whether [he] personally harbored an intent to aid the perpetrators in committing the life-endangering act with the knowledge that the act was dangerous to human life and that he consciously disregarded that danger." The court had "no doubt" that G.M. suffers from the mental health issues Dr. Lehman discussed, and did so during the attack on Hillman. And it found that G.M. "did not personally appreciate that his conduct and the conduct of others was dangerous to human life at that time." It nevertheless found that he committed voluntary manslaughter:

5

"I do find in this case the lesser[-]included offense of voluntary manslaughter to be true, pursuant to Penal Code section 192[,] subsection (a).  And that is the unlawful killing of a human being without malice[,] [b]ased on heat of passion, sudden quarrel[,] or imperfect self[-]defense.  And I just believe that there was no plan clearly to end Mr. Hillman's life on that evening."

The court ordered G.M. suitably placed in a secure facility, for a maximum term of six years.

## DISCUSSION

G.M. contends there was insufficient evidence to support the finding that he committed voluntary manslaughter because the juvenile court found that he did not harbor reckless disregard for human life.  We disagree.

"Murder, whether in the first or second degree, requires malice aforethought."  (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*), superseded by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)  "Malice can be express or implied."  (*Gentile*, at p. 844.)  "It is express when there is a manifest intent to kill [citation]; it is implied if someone kills with 'no considerable provocation or when the circumstances attending the killing show an abandoned and malignant heart' [citation]."  (*Ibid.*, alterations omitted.)

Implied malice has " ' "both a physical and a mental component." ' "  (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)  " ' "The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' " ' "  (*Ibid.*)   " ' "The mental component is the requirement that the defendant 'knows that [their] conduct endangers the life of another

6

and acts with a conscious disregard for life.' " ' " (*Ibid.*, alterations omitted.)

"When a person directly perpetrates a killing, it is the perpetrator who must possess . . . malice." (*Gentile, supra*, 10 Cal.5th at p. 844.) "[W]hen a person directly aids and abets a murder," however, it is "the aider and abettor [who] must possess malice aforethought." (*Ibid.*)

If malice is negated, an unlawful killing may be voluntary manslaughter rather than murder. (*People v. Landry* (2016) 2 Cal.5th 52, 97; see § 192, subd. (a).) "[M]alice may be negated by evidence that . . . the defendant acted in a sudden quarrel or heat of passion." (*Landry*, at p. 97.) This occurs when " ' "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " ' " (*Ibid.*, alterations omitted.) Malice may also be negated by the "imperfect defense of others," which is "the actual but unreasonable belief [the defendant] must defend another from imminent danger of death or great bodily injury." (*People v. Trujeque* (2015) 61 Cal.4th 227, 270-271.)

G.M. argues the juvenile court's statement that he "did not personally appreciate that his conduct and the conduct of others was dangerous to human life" conflicts with the mental state required for voluntary manslaughter, undermining the finding that he committed that crime. But this inconsistency does not demonstrate there was insufficient evidence to support the court's finding that G.M. committed voluntary manslaughter. (Cf. *People v. Lewis* (2001) 25 Cal.4th 610, 656 [inconsistent verdicts are allowed to stand].) In our view, the court understood the mental

7

state required to find that G.M. committed voluntary manslaughter. It considered CALCRIM Nos. 570 and 571—both of which state that voluntary manslaughter involves a killing that would otherwise be murder—and explained how there was evidence that supported each theory. It noted there was "some evidence" that Wiley-Yancy provoked the STRTP residents, including G.M., by daring I.C. to hit him and laughing when he did. And it noted that G.M.'s participation in the attacks on Hillman was unreasonable.

The prosecutor argued against these theories, emphasizing that, in her view, G.M. acted with implied malice. Defense counsel similarly discussed implied malice, arguing the prosecutor had not proven that G.M. acted with conscious disregard for human life. The juvenile court reiterated the proper mental state when finding that G.M. committed voluntary manslaughter, stating that the crime is "the unlawful killing of a human being without malice[,] [b]ased on heat of passion, sudden quarrel[,] or imperfect self[-]defense."

Moreover, when we review for substantial evidence, we do not evaluate statements in isolation. Rather, "we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, italics omitted.) So long as "[t]he record . . . disclose[s] substantial evidence to support the [juvenile court's finding]—i.e., evidence that is reasonable, credible, and of solid value"—reversal is unwarranted. (*Ibid.*)

Here, substantial evidence supports the juvenile court's finding that G.M. acted with a conscious disregard for Hillman's life. Hillman was staggering around the courtyard and said he could not breathe after the first attack on him. But STRTP

8

residents—including G.M.—then attacked again, punching and kicking him, pulling his hair, and stomping on his head. During this attack Hillman again said he could not breathe. He was also stumbling and needed the assistance of other Wayfinder staff members to get to his feet. Despite these indications of injury, G.M. and other STRTP residents again attacked Hillman. Given these indications of injury, it can be inferred that G.M. knew that he and his fellow STRTP residents' actions were dangerous to human life and that he consciously disregarded that danger.

Substantial evidence also supports the court's finding that the implied malice G.M. harbored was later negated because of heat of passion or imperfect self-defense. As the court noted, there was evidence of provocation when Wiley-Yancy dared I.C. to hit him and then laughed at I.C. It could also be inferred that G.M. unreasonably went to I.C.'s aid. Either factor was sufficient to negate the implied malice G.M. harbored. Substantial evidence thus supports the determination that G.M. had the mental state required to commit voluntary manslaughter.

DISPOSITION

The juvenile court's jurisdictional and dispositional orders, entered March 29, 2022, are affirmed.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.          YEGAN, J.

9

J. Christopher Smith, Judge

Superior Court County of Los Angeles

_____

Stephen A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael C. Keller and Charles S. Lee, Deputy Attorneys General, for Plaintiff and Respondent.